THE PEOPLE OF PUERTO RICO, Plaintiff and Appeppant, *v.* THE SHELL COMPANY (PUERTO RICO) LTD. ET AL., Defendants and Appellees.

No. 7482.   Argued May 12, 1939.—Decided February 6, 1940.

B. *Fernández García,* Attorney General, *Enrique Córdova Díaz,* Assistant Attorney General, *R. A. Gómez,* Prosecuting Attorney of Supreme Court, *Miguel Guerra Mondragón* and *Rafael Rivera Zayas,* Associated Attorneys, for appellant.   *Jaime Sifre Jr., Antonio J. Matta, James R. Beverley, R. Castro Fernández, Ryder Patten, Hartzell, Kelly & Hartzell, Rafael O. Fernández, José López Baralt* and *José Carbia Miranda* for appellees.

MR. JUSTICE TRAVIESO delivered the opinion of the court.

The People of Puerto Rico appeals from an order of the District Court of San Juan sustaining demurrers and dismissing the information against respondents.

On July 13, 1934, the District Attorney of San Juan filed an amended information against the above named corporations and individuals, charging them with a violation of the provisions of the insular law entitled ''An Act to protect trade and commerce against unlawful restraints and monopolies'', approved March 14, 1907. The principal allegations of said information read as follows:

''And the District Attorney alleges that the above named corporations, within the period of time stated in this information, illegally, voluntarily and maliciously and in persuance of a common plan previously designed and agreed between themselves, entered into a combination and confabulation, each one with the others, for the sole purpose of restraining and obstructing the legal and free competition between said corporations and the legal and free competition in the traffic and commerce and in the business of distribution and sale of gasoline in the judicial district of San Juan and in the Municipality of San Juan, within the jurisdiction of this Court; and said common plan and purpose so designed and agreed upon was carried out and put into practice through the agents, representatives and employees whose names are set forth in the second paragraph of this information. . .

''And the District Attorney alleges that said corporations and said agents, managers, representatives and employees, for the purpose of carrying out and putting into practice their mutually designed and agreed common plan, prior to the filing of these proceedings and within the period of time already stated, did unlawfully, wilfully and maliciously agree and decide to fix from time to time arbitrary and uniform prices for which gasoline should be sold, wholesale and retail, within the Municipality and Judicial District of San Juan, and in that manner, by virtue of said agreement, they fixed, maintained, imposed and exacted uniform prices, and have continued and still continue to illegally maintain and exact such arbitrary prices and to obtain them from consumers; . . .''

The information proceeds to state that as a part of their alleged common plan the defendant companies agreed to sell gasoline only to those retail dealers who would bind themselves to sell it at the only price fixed by the companies; that the companies succeeded in securing the consent of the

defendant retailers to sell only at the prices fixed by the companies; that to insure the success of their common plan, the defendant companies agreed among themselves and with the defendant retail dealers to impose fines and penalties upon any dealer who should sell gasoline for a price lower than the price fixed by the defendant companies, the penalties consisting sometimes in the temporary suspension of the supply of gasoline to the guilty dealer, and at other times in the absolute suspension of such supply, thereby eliminating the guilty dealer from the business.

The defendants demurred to the information upon the following grounds:

1. That the information charges more than one offense, in violation of Section 77 of the Code of Criminal Procedure of Puerto Rico.

2. That the District Court of San Juan has no jurisdiction over the subject matter in this case:

(a) Because the Act of March 14, 1907, supra, ceased to have force and effect when the National Congress passed the act entitled "An Act to encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes," approved June 16, 1933, by the President of the United States.

(b) Because said Act of March 14, 1907, supra, also ceased to have force and effect upon the approval on August 19, 1933, of the "Code of Fair Competition" in accordance with the provisions of the "National Industrial Recovery Act," which Act was in force in Puerto Rico during the period of time covered by the second amended information, and when the Legislature of Puerto Rico enacted Act No. 2, approved by the Governor on August 15, 1933.

(c) Because if said insular anti-trust law was in force at any time after June 16, 1933, which respondents deny, the said law ceased to have effect upon the approval of the modifications for Puerto Rico of the "Code of Fair Competition for the Petroleum Industry," under the provisions of the "National Industrial Recovery Act" of June 16, 1933.

(d) Because even assuming that the said anti-trust law was in force and that the acts charged were true, the said acts were sanctioned by the law of Congress entitled "An Act to encourage Na-

tional Industrial Recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes," approved June 16, 1933.; by the "Code of Fair Competition for the Petroleum Industry," approved by the President on August 19, 1933, and amendments thereto approved March 27, 1934; and by Act No. 2 of the Legislature of Puerto Rico, approved August 15, 1933; and that the said sanction operates as a full legislative pardon, which legalizes anything that prior thereto might have been illegal.

(e) Because the facts alleged in the second amended information do not constitute a public offense.

On August 23, 1938, the district court rendered its judgment sustaining the demurrer and ordering the dismissal of the information, from which order The People of Puerto Rico has taken the present appeal.

The appellant alleges that the district court erred:

1. When it decided that the local Antitrust Act of March 14, 1907, was not in force on March 19, 1934, when the original information was filed, for the alleged reason that said law was suspended by and ceased to have effect upon the approval of the "National Industrial Recovery Act" on June 16, 1933, and also upon the approval by the Legislative Assembly of Puerto Rico of Act No. 2 of August 15, 1933.

2. When it took judicial notice of the fact that the President of the United States, by virtue of the authority granted to him by the "National Industrial Recovery Act," approved on August 19, 1933, a code entitled "Code `of Fair Competition for the Petroleum Industry," and also of the fact that the Administrator of said Code of Fair Competition, approved on March 27, 1934, a Code entitled "Code of Fair Competition for the Petroleum Industry in Puerto Rico."

3. When—assuming that the Court was authorized to take judicial notice of the existence of said Codes—it did not decide that the said Codes did not authorize the acts specified in the amended information.

4. When it sustained the demurrer and dismissed the information.

The constitutionality and validity of the insular antitrust legislation is not involved in the present appeal. That question was finally disposed of by the Supreme Court

of the United States in *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 82 Law Ed. 235.

The fundamental question submitted to our decision is: What was the effect upon the Insular Antitrust Law of (*a*) the National Industrial Recovery Act of June 16, 1933, (*b*) Act No. 2 of the Legislative Assembly of Puerto Rico of August 15, 1933, and (*c*) the Codes of Fair Competition for the Petroleum Industry.

The pertinent parts of the lower court's opinion are the following:

"It is a matter of judicial knowledge that by virtue of the authority conferred on him by law, the President of the United States approved, on August 19, 1933, the code entitled 'Code of Fair Competition for the Petroleum Industry.' There was also approved and promulgated on March 27, 1934, the 'Code of Fair Competition for the Petroleum Industry in Puerto Rico,' by Harold L. Ickes, Administrator of the Code of Fair Competition for the Petroleum Industry.

"The antitrust laws of the United States as well as the law of Puerto Rico of March 14, 1907, were suspended and ceased to have effect upon the approval of the National Industrial Recovery Act. of the Congress of the United States, which was enacted for the purpose of carrying out the vast program of industrial rehabilitation which was and is the goal of the Administration of President Franklin D. Roosevelt and bringing to an end, among other things, the chaotic condition of business. And should any doubt remain in the mind of the court, the same must be dispelled by the mere reading of the law passed by the Legislative Assembly of Puerto Rico and approved by the Governor of Puerto Rico on August 15, 1933, entitled 'An Act to declare a policy in view of the existence of an emergency productive of unemployment and disorganization of industry; to exempt certain acts from the provisions of the antitrust laws is force in Puerto Rico, and for other purposes.' Section 2 of this Law provides:

" 'While the Act of Congress approved June 16, 1933, to encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes, otherwise known as the National Industrial Recovery Act, is in effect and for sixty days thereafter, any code, agree-

ment or license, approved, prescribed, or issued and in effect under Title I of the said act, and any action complying with the provisions thereof taken during such periods, shall be exempt from the provisions of the Antitrust Laws in force in Puerto Rico and particularly the provisions of the law "To protect commerce against restrictions and monopolies," approved March 14, 1907.'

"According to general principles of law and jurisprudence, when a law of a penal nature is repealed or the effects thereof suspended, the penalties imposed by it cannot be made effective in cases of violations committed while the law was in force, unless the suspensive or repealing statute should so provide in a clear and direct manner. 16 C. J. 70, 72; *State* v. *Mitchell,* 110 Texas 548; *United States* v. *Chamberg,* 291 U. S. 276, 78 L. Ed. 763. This doctrine has been accepted in Puerto Rico in *Ex parte Mauleón,* 4 P.R.R. 119, and in *People* v. *Alvarez,* 47 P.R.R. 716. The law under which a man is indicted must be in force at the time of the commision of the act charged in the indictment and also at the time when the indictment is filed. (Citations.) . . . .

"*     *     *     *     *     *     *

"We agree in that the law was not made to protect the commission of illegal acts. But in order that an act may be illegal there must be a law declaring it so. If, as hereinbefore stated, the federal and territorial antitrust laws were suspended, precisely with regard to the acts charged, that is selling petroleum at a uniform and fixed price, such acts ceased to be illegal and converted themselves into legal acts.

"*     *     *     *     *     *     *

"It is true that the Code of Fair Competition for the Petroleum Industry in Puerto Rico was not approved and promulgated until March 27, 1934, that is, until eight days after the filing of the original information, but it is also true that from and after June 16, 1933, when the President of the United States approved the National Industrial Recovery Act, and more specially from and after August 15, 1933, when the Governor of Puerto Rico approved the Act to declare a policy in view of the existence of an emergency etc., the antitrust laws in the United States, including Puerto Rico, were suspended."

It is evident that the court below proceeded to sustain the demurrer and to dismiss the information upon the theory that the inescapable and automatic effect of Section 5 of the

National Industry Recovery Act (15 U. S. C. A. sec. 705) and of section 2 of the insular law of August 15, 1933, was to suspend and to leave without force and effect the provisions of the Sherman Antitrust Act and of the local antitrust law of March 14, 1907. Such conclusion is in our opinion erroneous.

The National Industrial Recovery Act provides:

"Sec. 705. *Exemption of codes, agreements and licenses from operation of anti-trust laws;* etc.

"While this chapter is in effect (or in the case of a license, while section 704 (*a*) of this title is in effect) and for sixty days thereafter, any code, agreement, or license approved, prescribed, or issued and in effect under this chapter, and any action complying with the provisions thereof taken during such period, shall be exempt from the provisions of the antitrust laws of the United States."

The insular law of August 15, 1933, section 2, *supra,* follows the exact language of the federal statute.

We should bear in mind that the original information was filed March 19, 1934, and that it specifically alleges that the acts imputed to the defendants were committed within the year immediately preceding the date of the commencement of this criminal proceedings by the filing of an information. There is no way of determining whether the specific acts imputed to the defendants were committed before or after the enactment of the National Recovery Act or of the insular law of August 15, 1933.

There is no doubt in our minds that if the above quoted provisions of the National Recovery Act and of the insular law could be construed as a repeal of the federal and of the insular antitrust laws, the defendants should be exempt from prosecution for any illegal conspiracy or combination in restraint of trade into which they might have entered, either before or after the enactment of the repealing statutes. We are of the opinion that no such effect can be attributed to the legislation under discussion. Repeals by implication should not be favored. The intention of the legislature to

repeal "must be clear and manifest." *Red Rock* v. *Henry,* 106 U. S. 596, 601, 602, 27 L. Ed. 251, 253. The clear and manifest purpose of Section 2 of the National Industrial Recovery Act (15 U.S.C.A. sec. 705) and of section 2 of the insular law of August 15, 1933, was to exempt from the provisions of the antitrust laws of the United States and of Puerto Rico any code, agreement or license approved, prescribed or issued in accordance with the provisions of said acts and any action taken under such code, agreement or license, while the said laws are in effect and for sixty days thereafter.

That the intention of the Congress was not to repeal the antitrust laws, but merely to exempt from its provisions those who complied with certain conditions precedent to the enjoyment of the exemption, is clearly and manifestly shown by the following provisions of the National Industrial Recovery Act (15 U.S.C.A. secs. 705–a and 706):

"Sec. 705-*a*. *Limitation and exemption provided in section 705,*

"The exemption provided in section 705 shall extend only to agreements and action thereunder (1) putting into effect the requirements of section 706(*a*), including minimum wages, maximum hours, and prohibition of child labor; and (2) prohibiting unfair competitive practices which offend against existing law, including the antitrust laws, or which constitute unfair methods of competition under sections 41 to 51 of this title. (June 14, 1935, c. 246, section 2, 49 Stat. 375)

"Section 706. *Filing required statements as prerequisite to receiving benefits of law, rules and regulations; investigations by Federal Trade Commission.*

"(*a*) No trade or industrial association or group shall be eligible to receive the benefit of the provisions of this chapter until it files with the President a statement containing such information relating to the activities of the association or group as the President shall by regulation prescribe.

"(*b*) The President is authorized to prescribe rules and regulations designed to insure that any organization availing itself of the benefits of this chapter shall be truly representative of the trade or industry or subdivision thereof represented by such organization.

Any organization violating any such rule or regulation shall cease to be entitled to the benefits of this chapter.

"(c) Upon the request of the President, the Federal Trade Commission shall make such investigations as may be necessary to enable the President to carry out the provisions of this chapter, and for such purposes the Comission shall have all the powers vested in it with respect of investigations under chapter 2 of this title. (June 16, 1933, c. 90, Title I, sec. 6, 48 Stat. 198.)"

The Supreme Court of the United States has recently passed upon a similar situation in the case of *United States* v. *Borden Company, et al.,* decided December 4, 1939, and reported in 84 L. Ed. 143. The indictment in said case, charging combination and conspiracy in violation of sec. 1 of the Sherman Anti-Trust Act, was challenged by demurrers and motions to quash upon the ground that the production and marketing of agricultural products, including milk, had been removed from the purview of the Sherman Act by the Agricultural Marketing Agreement Act of June 3, 1937; and also that the Pure Milk Association, as an agricultural cooperative association, its officers and agents were exempt from prosecution under the Sherman Act by sec. 6 of the Clayton Act (15 U.S.C.A. sec. 17). The District Court held in substance that because of the effect of the later statutes the indictment did not charge an offense under the Sherman Anti-Trust Act and consequently dismissed the indictment. The Supreme Court, in its opinion reversing the judgment of the district court and remanding the case for further proceedings, said:

"It will be observed that the District Court attributes this effect to the Agricultural Marketing Agreement Act per se, that is, to its operation in the absence, and without regard to the scope and particular effect, of any marketing agreements made by the Secretary of Agriculture or of any orders issued by him pursuant to the Act. In the opinion of the court below, the existence of the authority vested in the Secretary of Agriculture, although unexercised, wholly destroys the operation of sec. 1 of the Sherman Act with respect to the marketing of agricultural commodities.

64

"We are of the opinion that this conclusion is erroneous. No provision of that purport appears in the Agricultural Act. While effect is expressly given, as we shall see, to agreements and orders which may validly be made by the Secretary of Agriculture, there is no suggestion that in their absence, and apart from such qualified au-thorization and such requirements as they contain, the commerce in agricultural commodities is stripped of the safeguards set up by the Anti-Trust Act and is left open to the restraints, however unreasonable, which conspiring producers, distributors and their allies may see fit to impose. We are unable to find that such a grant of im--munity by virtue of the inaction, or limited action, of the Secretary has any place in the statutory plan. We cannot believe that Congress intended to create 'so great a breach in historic remedies and sanctions.'

"*          *          *          *          *          *          *

"The Sherman Act is a broad enactment prohibiting unreasonable restraints upon interestate commerce, and monopolization or attempts to monopolize, with penal sanctions. The Agricultural Act is a limited statute with specific reference to particular transactions which may be regulated by official action in a prescribe manner. . . . .

"*          *          *          *          *          *          *

". . . To carry out that policy a particular plan is set forth. Farmers and others are not permitted to resort to their own devices and to make any agreements or arrangements they desire, regardless of the restraints which may be inflicted upon commerce. The statutory program to be followed under the Agricultural Act requires the participation of the Secretary of Agriculture who is to hold hearings and make findings. The obvious intention is to provide for what may be found to be reasonable arrangements in particular instances and in the light of the circumstances disclosed. The methods. which the Agricultural Act permits to attain that result are twofold, marketing agreements and orders. To give validity to marketing agreements the Secretary must be an actual party to the agreements. . . . . That the field covered by the Agricultural Act is not coterminus with that covered by the Sherman Act is manifest from the fact that the former is thus delimited by the prescribed action participated in and directed by an officer of government proceeding under the authority specifically conferred by Congress. As to agreements and arrangements not thus agreed upon or directed by the Secretary, the Agricultural Act in no way impinges upon the prohibitions and penalties of the Sherman Act, and its condemnation of

private action is entering into combinations and conspiracies which impose the prohibited restraint upon interstate commerce remains un-. touched.

"It is not necessary to labor the point, for the Agricultural Act itself expressly defines the extent to which its provisions make the antitrust laws inapplicable. That definition is found in sec. 8(b) of the Agricultural Adjustment Act carried into the Agricultural Marketing Agreement Act in relation to marketing agreements, and provides as follows:

" 'In order to effectuate the declared policy of this chapter, the Secretary of Agriculture shall have the power, after due notice and opportunity for hearing, to enter into marketing agreements with processors, producers, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof, only with respect to such handling as is in the current of interstate or foreign commerce or which directly burdens, obstructs, or affects interstate or foreign commerce in such commodity or product thereof. The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful; *Provided,* That no such agreement shall remain in force after the termination of this chapter.'

" *       *       *       *       *       *       *

"These explicit provisions requiring official participation and authorizations show beyond question how far Congress intended that the Agricultural Act should operate to render the Sherman Act inapplicable. If Congress had desired to grant any further immunity, Congress doubtless would have said so.

"An arrangement made with the Secretary as a party, or an order made by him, or an arbitration award or agreement approved by him, pursuant to the authority conferred by the Agricultural Act and within the terms of the described immunity, would of course be a defense to a prosecution under the Sherman Act to the extent that the prosecution sought to penalize what was thus validly agreed upon or directed by the Secretary. Further than that the Agricultural Act does not go.

" *       *       *       *       *       *       *

"Our conclusion is that the Agricultural Adjustment Act as reenacted and amended by the Agricultural Marketing Agreement Act affords no ground for construing the Sherman Act as inapplicable to the charges contained in counts one, two and four.''

We are not concerned with nor are we passing judgment on the guilt or innocence of the defendants. If the agreement under which the defendants proceeded to fix, impose and collect an arbitrary uniform price on the gasoline sold by them, was entered into in compliance with those conditions specified in secs. 704 to 706 of the National Industrial Recovery Act, so as to entitle the said defendants to receive the benefit of the exemption from the antitrust laws, as provided in sec. 705 of said act, that would constitute an absolute defense to the charge contained in the information. If, on the other hand, the defendants proceeded to operate under a common plan and agreement, as charged in the information, that is, ignoring and not complying with the aforesaid conditions precedent, then they would not be eligible to receive the benefit of the exemption from prosecution under the antitrust laws. We can say here, paraphrasing the words of the court in *U. S.* v. *Needle Trades Workers' Industrial Union* (D.C.N.Y.) 10 F. Supp. 201: "If a conspiracy of the kind alleged in this indictment has been approved in any of the codes adopted under the later act, our attention has not been called to it."

We must dismiss as unsound respondents' argument that the legal effect of the mere approval of the Code of Fair Competition for the Petroleum Industry in Puerto Rico was to pardon, condone and legalize the acts committed by them prior to the approval of said Code. According to the information, the acts imputed to the defendants were committed during the year from March 19, 1933, to March 19, 1934. The Code for Puerto Rico was approved March 27, 1934, that is, eight days after the filing of the information. The Code of Fair Competition for the Petroleum Industry was approved by the President on August 19, 1933, seven months before the filing of the original information. Copies of both codes have been submitted for our inspection. In both codes we find an identical provision, Section 5 of Article I, reading as follows:

"Section 5. Agreements between competitors within the industry for the purpose of accomplishing the objectives of this Code, or any of them, or for the purpose of eliminating wasteful duplication of manufacturing, transportation, and marketing facilities are hereby expressly permitted, *but such agreements shall not become operative until specifically approved by the President, and suitable public notice shall have been given of such agreements.* Such agreements may at any time be disapproved by the President and upon such disapproval they shall cease to be valid." (Italics ours.)

There is no contention on the part of the respondents that the agreement or plan or combination under which they proceeded to do the acts charged in the information was ever approved by the President of the United States, as required by Section 5 of the Codes, *supra.* We do not feel authorized to presume the existence of such approval, especially in view of the statement made in respondents' brief "that these defendants have never said that they were directly authorized by the President to enter into any agreement."

Applying the reasoning of the Supreme Court of the United States in *United States* v. *Borden Company, supra,* to the case at bar, we feel bound to hold that the amended information herein charges clearly and sufficiently in the language of the statute a violation of the provisions of Section 1 of the Puerto Rico Anti-Trust Act of 1907; that neither the enactment of the National Industrial Recovery Act nor the approval by the Legislature of Puerto Rico of Act No. 2 of August 15, 1933, operated *per se* either as a repeal or as a suspension of the federal and insular anti-trust statutes or of either of them; that both the insular and the federal antitrust statutes remained in full force and effect after the passage of the emergency legislation; and that any person who violated the provisions of the anti-trust laws either before or after the enactment of the emer- gency legislation is subject to prosecution and punishment, unless he is able to prove that the acts with which he is charged were authorized by a code, agreement or license

approved, prescribed, or issued as provided by said legislation.

The order of the district court must be reversed and the case remanded to said court for further proceedings in conformity with this opinion.

Mr. Justice Wolf concurs in the judgment and in the opinion with the exception of the paragraph thereof beginning with the words "We are not considering" and ending with the citation from 10 F. Supp. 201, for we deem the same unnecessary as it refers to questions foreign to the issue between the parties.