## PUERTO RICO *v.* THE SHELL CO. (P. R.), LIMITED, ET AL.

No. 18. Argued November 9, 1937.—Decided December 6, 1937.

254

Mr. *William Cattron Rigby,* with whom *Mr. Nathan R. Margold* was on the brief, for petitioner.

*Messrs. William D. Whitney* and *James R. Beverley* for respondents.

*Messrs. Oscar B. Frazer* and *Gabriel I. Lewis* were on the brief for Pyramid Products, Inc., et al., respondents.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This is a criminal proceeding brought by petitioner against the respondents in the insular district court of San Juan, Puerto Rico. An information filed by the district attorney charged respondents with entering into a conspiracy in restraint of trade in violation of the local anti-trust act, passed by the Legislature of Puerto Rico March 14, 1907. Demurrers to the information were sustained by the district court on the ground that the Sherman Anti-trust Act of 1890, supplemented by the Clayton Act of 1914, covered the entire field embraced by the local anti-trust act, and the latter, therefore, was void. The Supreme Court of Puerto Rico accepted that view and dismissed the appeal; and its judgment was affirmed on appeal by the court below. 86 F. (2d) 577. The single question which we have to decide is whether the existence of § 3 of the Sherman Act precluded the adoption of the local act by the insular legislature.

The pertinent provisions of the Sherman Act and the local act are set forth in the margin.[1] Section 3 of the

---

[1] Sherman Act (July 2, 1890, c. 647, 26 Stat. 209):

"Sec. 3. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce

The Puerto Rico Act of March 14, 1907 (Laws 1907, p. 328):

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade, commerce, business transactions, and lawful and free competition in a town, or among the several towns of

Sherman Act and § 1 of the local act, so far as the question here involved is concerned, are substantially identical. Section 4 of the Sherman Act confers jurisdiction

between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000 or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 4. The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. . . ."

By § 24 (2) of the Judicial Code, 28 U. S. C. § 41 (2), the district courts of the United States are given jurisdiction—"Of all crimes and offenses cognizable under the authority of the United States."

Puerto Rico is hereby declared to be illegal. Every person who shall make any such contract or engage in any such conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both such punishments in the discretion of the court.

.    .    .

"Section 3. The district courts of the island are hereby vested with jurisdiction to prevent, prohibit, enjoin and punish violations of this law; and it shall be the duty of the attorneys of the district courts of the island to institute proceedings of injunction or any other civil proceeding to prevent, prohibit, enjoin, and restrain such violations. . . ."

in respect of violations of the act upon the several district courts of the United States. Section 3 of the local act confers jurisdiction upon the district courts of Puerto Rico in respect of violations of that act.

*First.* Section 3 of the Sherman Act extends to "any territory of the United States." But it is urged that Puerto Rico cannot be brought within the intent of this phrase, and, therefore, the section does not apply to that dependency. The point is not well made. When the Sherman Act was passed (1890), we had no insular dependencies; and, necessarily, the application of § 3 did not extend beyond our continental domain; and, undoubtedly, it was this domain which was in the immediate contemplation of Congress. Certainly, Congress at that time did not have Puerto Rico in mind. But that is not enough. It is necessary to go further and to say that if the acquisition of that insular dependency had been foreseen, Congress would have so varied its comprehensive language as to exclude it from the operation of the act. *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 644; *Takao Ozawa* v. *United States,* 260 U. S. 178, 195–196; *United States* v. *Thind,* 261 U. S. 204, 207–208. The only question, therefore, is whether the word "territory," as used in § 3 of the Sherman Act, properly can be applied to a dependency now bearing the relation to the United States which is borne by Puerto Rico.

In *Balzac* v. *Porto Rico,* 258 U. S. 298, 304–305, it was held that, although the Sixth Amendment of the Constitution with respect to the right of trial by jury applied to the territories of the United States, it did not apply to territory belonging to the United States which had not been incorporated into the Union; and that neither the Philippines nor Porto Rico was territory which had been so incorporated or had become a part of the United States, as distinguished from merely belonging to it. But it is evident, from a consideration of the pertinent acts

of Congress and the decisions of this court with respect to these acts, that whether Puerto Rico comes within a given congressional act applicable in terms to a "territory," depends upon the character and aim of the act. Words generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed. *Atlantic Cleaners & Dyers* v. *United States,* 286 U. S. 427, 433; *Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84, 86, 87–88. Thus, although Puerto Rico is not a territory within the reach of the Sixth and Seventh Amendments and may not be a "territory" within the meaning of the word as used in some statutes, we held in *Kopel* v. *Bingham,* 211 U. S. 468, 474, 475, 476, that Puerto Rico was a "territory" within the meaning of § 5278 of the Revised Statutes, which provides for the demand and surrender of fugitive criminals by governors of territories as well as of states. The court said that it was impossible to hold that Puerto Rico was not intended to have power to reclaim fugitives from its justice, or that it was intended that it should be an asylum for fugitives from the United States. The word "territory" as used in that statute was defined as meaning "a portion of the country not included within the limits of any State, and not yet admitted as a State into the Union, but organized under the laws of Congress with a separate legislature under a territorial governor and other officers appointed by the President and Senate of the United States." And the court concluded, "It may be justly asserted that Porto Rico is a completely organized Territory, although not a Territory incorporated into the United States, and that there is no reason why Porto Rico should not be held to be such a Territory

as is comprised in § 5278." See *Porto Rico* v. *Rosaly y Castillo,* 227 U. S. 270, 274. Compare *Talbott* v. *Silver Bow County,* 139 U. S. 438, 444-445.

With equal force, it may be said here that there is no reason why Puerto Rico should not be held to be a "territory" within the meaning of § 3 of the Sherman Act. We pointed out in the *Atlantic Cleaners & Dyers* case, *supra,* p. 435, that in the light of the applicable history and circumstances, it was apparent that Congress meant to deal comprehensively with the subject of contracts, combinations, and conspiracies in restraint of trade, "and to that end to exercise all the power it possessed"; that while Congress in passing § 1 exercised only the power conferred by the commerce clause, in passing § 3 it exercised a general power, unlimited by that clause. We therefore concluded that the word "trade" as used in § 3 should be given a more extended meaning than the same word as used in § 1.

If, as we there determined, Congress intended by the Sherman Act to exert all the power it possessed in respect of the subject matter—trade and commerce—, it is equally reasonable to conclude that Congress intended to include all territories to which its powers might extend. The same reason which requires the utmost liberality of construction in respect of the word "trade," also requires the same degree of liberality of construction in respect of the word "territory"; and we hold, accordingly, that the word "territory" was used in its most comprehensive sense, as embracing all organized territories, whether incorporated into the United States or not, including Puerto Rico.

*Second.* The court below held that although § 1 of the local act contained some words not to be found in § 3 of the Sherman Act, the pertinent provisions were in substance the same; that the act charged in the information as a crime under the local statute was the

same as that denounced as a crime in the Sherman Act; and that in each instance the offense was a crime against the sovereignty of the United States. With that view we agree. But that court concluded that the act of Congress preëmpted the ground occupied by the local act and superseded it; and consequently the local district court was without jurisdiction of the offense. With that conclusion we are unable to agree.

1. Section 14 of The Foraker Act, passed April 12, 1900, c. 191, 31 Stat. 77, 80, provided that the statutory laws of the United States, not locally inapplicable, should have the same force and effect in Puerto Rico as in the United States, with certain exceptions not material here. Section 27 (p. 82) provided "That all local legislative powers hereby granted shall be vested in a legislative assembly . . ." And by § 32 (p. 83–84), it was provided that the legislative authority "shall extend to all matters of a legislative character not locally inapplicable . . ." These various provisions are continued in force by §§ 9, 25 and 37 of the Organic Act of March 2, 1917, c. 145, 39 Stat. 951. These provisions do not differ in substance from the various provisions relating to the powers of the organized and incorporated continental territories of the United States, in respect of which this court said in *Clinton* v. *Englebrecht,* 13 Wall. 434, 441, that the theory upon which these territories have been organized "has ever been that of leaving to the inhabitants all the powers of self-government consistent with the supremacy and supervision of National authority, and with certain fundamental principles established by Congress"; and in *Hornbuckle* v. *Toombs,* 18 Wall. 648, 655–656, we said: "The powers thus exercised by the Territorial legislatures are nearly as extensive as those exercised by any State legislature." See also *Cope* v. *Cope,* 137 U. S. 682, 684, where this court, speaking of this typical general provi-

sion contained in the Utah Organic Act, said that, with the exceptions noted in the provision itself, "the power of the Territorial legislature was apparently as plenary as that of the legislature of a State." In *Maynard* v. *Hill,* 125 U. S. 190, 204, the essential similarity of the various provisions in respect of the powers of territorial legislatures was pointed out, and it was said that what were "rightful subjects of legislation" was to be determined "by an examination of the subjects upon which legislatures had been in the practice of acting with the consent and approval of the people they represented."

The grant of legislative power in respect of local matters, contained in § 32 of the Foraker Act and continued in force by § 37 of the Organic Act of 1917, is as broad and comprehensive as language could make it. The primary question posed by the challenge to the validity of the act under consideration is whether the matter covered by the act is one "of a legislative character not locally inapplicable." It requires no argument to demonstrate that a conspiracy in restraint of trade within the borders of Puerto Rico is clearly a local matter, and that it falls within the precise terms of the power granted by §§ 32 and 37 of the respective acts in which the grant is found. The power being given without express limitation, a conclusion that the present exercise of the power is precluded by the existence of § 3 of the Sherman Act must rest upon the assumption that a congressional statute penalizing specific local behavior and a statute of Puerto Rico to the same effect cannot coexist. With due regard to the status of the territory, the character of its established government, the positive terms of the congressional grant of power, and the lack of conflict between the two acts, that assumption must be rejected.

2. The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination,

with an autonomy similar to that of the states and incorporated territories. *Gromer* v. *Standard Dredging Co.,* 224 U. S. 362, 370; *Porto Rico* v. *Rosaly y Castillo, supra,* p. 274. The effect was to confer upon the territory many of the attributes of *quasi*-sovereignty possessed by the states—as, for example, immunity from suit without their consent. *Porto Rico* v. *Rosaly y Castillo, supra.* By those acts, the typical American governmental structure, consisting of the three independent departments—legislative, executive and judicial—was erected. "A body politic"—a commonwealth—was created. 31 Stat. 79, § 7, c. 191. The power of taxation, the power to enact and enforce laws, and other characteristically governmental powers were vested. And so far as local matters are concerned, as we have already shown in respect of the continental territories, legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures.

This comprehensive grant of legislative power made by Congress plainly recognizes the great desirability of devolving upon the local government the responsibility of searching out local offenses and prosecuting them in the local tribunals. The insular Supreme Court in this case declared in emphatic terms the wisdom of such local control in respect of the matter dealt with by the act in question. Although striking down, with evident reluctance, the act as invalid, that court said: "The right of the Insular Legislature and officers to prosecute and punish such monopolies as may be set up within our jurisdiction is really inestimable. It was so understood by our Legislature when it took upon itself to legislate on the subject. This is a wholesome and necessary legislation that should be enforced through the insular courts. It must be admitted that The People of Puerto Rico has a special interest in prosecuting before the courts those citizens who violate its own laws. No matter how inter-

ested the National Government may be in prosecuting such offenses, instances might occur where the latter would pass unnoticed by the federal officers, or where, for some reason or other, such officers might not display the same activity and interest that is to be expected from the local officials."

3. In the light of the foregoing considerations, including the sweeping character of the congressional grant of power contained in the Foraker Act and the Organic Act of 1917, the general purpose of Congress to confer power upon the government of Puerto Rico to legislate in respect of all local matters is made manifest. In this connection it is significant that the only express limitation upon the power is that, in certain of its aspects, it shall be exercised consistently with the provisions of the respective acts. See §§ 37, 57 of the Organic Act, and § 32 of the Foraker Act. Nothing is expressed in these acts or, so far as we are advised, in any other federal act, which suggests a congressional intent to limit the exercise of the power of local legislation to those subjects in respect of which there is an absence of explicit legislation by Congress; and we find nothing in the nature of the power or in the consequences likely to ensue from the duplicate exercise of it which requires an implication to that effect.

Our attention is called to certain differences of language in the two acts; and it is urged that these differences create a "risk" of conflict of interpretation between the local courts and the federal district courts. The fear of conflicting decisions is more fanciful than real, since we agree with the court below that there is in fact no substantial conflict between the pertinent provisions of the two statutes. But in the unlikely event that, in spite of this conclusion, a conflict of decisions shall arise, the power of the federal appellate courts to resolve that conflict is clear. Secs. 128 (a) and 240, Judicial Code, as

amended by the Act of February 13, 1925, c. 229, 43 Stat. 936; 28 U. S. C. §§ 225, 347.

It likewise is clear that the legislative duplication gives rise to no danger of a second prosecution and conviction, or of double punishment for the same offense. The risk of double jeopardy [2] does not exist. Both the territorial and federal laws and the courts, whether exercising federal or local jurisdiction, are creations emanating from the same sovereignty. See *Balzac* v. *Porto Rico, supra,* p. 312. Prosecution under one of the laws in the appropriate court, necessarily, will bar a prosecution under the other law in another court. *Grafton* v. *United States,* 206 U. S. 333. In that case, Grafton, a soldier in the army, had been acquitted by a general court martial convened in the Philippine Islands of a crime not capital, alleged to have been committed in violation of the 62d Article of War. Subsequently, a criminal information in the name of the United States was filed in a Philippine court of first instance, charging him with the same offense committed in violation of a local law. This court held that the acquittal of the accused by the court martial precluded his being again tried for the same offense in the civil courts, for the reason that he would thus be put twice in jeopardy of punishment. The 62d Article of War [3] was a federal statute. Revised Statutes, § 1342. The general court martial was a federal tribunal. The Philippine act was a local law; and the court of first instance was a local court. But both of the laws and both

---

[2] The Fifth Amendment to the Constitution provides, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." Section 2 (the Bill of Rights) of the Puerto Rico Organic Act of 1917, 39 Stat. 951, provides that "no person for the same offense shall be twice put in jeopardy of punishment."

[3] "All crimes not capital . . . which officers and soldiers may be guilty of . . . are to be taken cognizance of by a general . . . court- [martial], . . . and punished at the discretion of such court."

of the courts owed their existence to the same supreme authority. The situation presented there was, in all essentials, the same as that presented here. The decision of the court in that case rested upon the ground that the accused, having been acquitted by the federal tribunal, could not be subjected to prosecution in another court, civil or military, of the same sovereignty. We held that although the same act might constitute distinct offenses against a state and against the United States, for both of which the accused might be prosecuted, that rule had no application to acts committed in the Philippine Islands. We said (pp. 354–355), "The Government of a State does not derive its powers from the United States, while the Government of the Philippines owes its existence wholly to the United States, and its judicial tribunals exert all their powers by authority of the United States. The jurisdiction and authority of the United States over that territory and its inhabitants, for all legitimate purposes of government, is paramount. So that the cases holding that the same acts committed in a State of the Union may constitute an offense against the United States and also a distinct offense against the State, do not apply here, where the two tribunals that tried the accused exert all their powers under and by authority of the same government—that of the United States."

An attempt is made to distinguish the *Grafton* case on the ground that but one statute was there involved— namely, the statute of the Philippine Islands—and that both the general court martial and the Philippine court undertook to enforce that statute. Obviously, that view is incorrect. The court-martial proceeding was not to enforce the Philippine legislation, but to enforce the 62d Article of War; and that article was none the less a federal law, distinct from the local law, because it might be necessary to refer to the local law to determine whether

the act charged against the soldier was embraced by the term "crimes" in the 62d Article. This is well illustrated by § 289 of the Criminal Code (18 U. S. C. § 468), which, in respect of offenses committed upon places subject to the exclusive jurisdiction of the United States within the limits of a state or organized territory or district, makes applicable the laws of such state, territory or district in respect of such offenses. Prosecutions under that section, however, are not to enforce the laws of the state, territory or district, but to enforce the federal law, the details of which, instead of being recited, are adopted by reference. See *United States* v. *Press Publishing Co.,* 219 U. S. 1.

4. The decisions of the supreme courts of four states, rendered when the states were newly-created from former territories, are, except in one particular, of which we shall speak later, in harmony with the views we have expressed. Those decisions, though not conclusive, are entitled to great weight, because they dealt with territorial powers in operation at a time so shortly before the rendition of the decisions that the judges who rendered them well may be credited with such knowledge of the purpose of these powers and their history and application, as to make these judges peculiarly competent to decide questions relating thereto.

The Supreme Court of Wyoming, in a very full and carefully drawn opinion, reached the conclusion that a statute of that territory defining and punishing the crime of bigamy was valid and enforceable, notwithstanding the fact that an act of Congress defined and prescribed punishment for the same crime when committed in any of the territories. *In re Murphy,* 5 Wyo. 297; 40 Pac. 398. Following its discussion in respect of the relations between the national and territorial governments, and the extensive powers which had been conferred upon the latter, that court (5 Wyo. 315; 40 Pac. 404) con-

cluded: " . . . the crime of bigamy as defined and punishable by act of congress, is a crime against the sovereignty of the United States. The act of congress embraces no express limitation upon the right of the territory to also punish the same act as an offense against it and its local laws, nor upon the local legislature to enact a law defining and providing a punishment therefor as an offense against the territorial sovereignty. As there are in practical and legal effect two governments, although the one emanates from the other, we are unable to perceive why the legislature of the territory under the general grant of power with which it was invested, may not have enacted a valid law assuming to punish as a territorial offense the crime of bigamy. It does not conflict with the United States statute. It could not and did not assume to destroy the force or effect of the congressional provision. It could not have assumed to offer immunity to those desiring to contract polygamous marriages. By silence, it could only have refused to punish it as a territorial crime. To avoid this possibility congress undertook to punish it as a crime against the Federal government." That decision was followed by the Supreme Court of Utah in *State* v. *Norman,* 16 Utah 457; 52 Pac. 986.

The Wyoming and the Utah courts thought that prosecution and punishment could be had under both statutes, and attempted to justify that view by invoking the rule applicable to state and federal statutes denouncing the same criminal acts. This, of course, in the light of our later decision in the *Grafton* case, is now seen to be erroneous; but the error does not affect the accuracy of the reasoning and conclusion of these courts upon the main point—that the local statute was a valid exercise of territorial power, notwithstanding the identical legislation by Congress.

In *Territory* v. *Guyott,* 9 Mont. 46; 22 Pac. 134, a territorial statute making it a felony to sell, barter or give

intoxicating liquor to an Indian, was sustained against the contention that the authority of the territory to pass the statute had been foreclosed by § 2139 U. S. Rev. Stats., which defines and punishes the same offense.

*Territory* v. *Long Bell Lumber Co.*, 22 Okla. 890; 99 Pac. 911, involved the validity of the anti-trust act passed by the former territorial legislature. Suits were brought against the defendants, charging violations of the territorial act, which were also violations of the Sherman Act. The court sustained the validity of the territorial act, holding that it was not repugnant to or in conflict with the federal act. In doing so, it followed the reasoning of, and relied upon, the Wyoming, Montana and Utah decisions, above cited.

The Supreme Court of the Territory of Arizona, in *Territory* v. *Alexander*, 11 Ariz. 172; 89 Pac. 514, had before it for consideration a bigamy statute like that involved in the Wyoming case, and erroneously held it to be invalid. In reaching that conclusion, it expressly rejected the Wyoming, Utah and Montana decisions upon the authority of *Davis* v. *Beason*, 133 U. S. 333, a case which we shall presently consider.

5. There is some general language in *El Paso & N. E. Ry. Co.* v. *Gutierrez*, 215 U. S. 87, and *Davis* v. *Beason*, *supra*, which, considered apart from the question which was involved and apart from the opinions in their entirety, seems to support the decision of the court below in the present case. The opinion of the court below and the argument of respondents here rest in the main upon these cases. An examination of them, however, will show that they have been misunderstood. The *Gutierrez* case involved the validity of a statute of the Territory of New Mexico, which provided that no action for injuries inflicting death caused by any person or corporation in the territory should be maintained unless the person claiming damages should, within 90 days after the infliction

of the injuries complained of and 30 days before commencing suit, serve upon the defendant an affidavit covering certain specified particulars. The statute also required that suit must be brought within a year and in a specified district court of the territory. The statute is set forth in full in the margin of the opinion of this court in *Atchison, T. & S. F. Ry. Co.* v. *Sowers,* 213 U. S. 55, 59–63. An action was brought in Texas by Enedina Gutierrez against the railway company to recover damages for the death of her intestate. The accident causing the death happened in New Mexico, and the railway company set up the New Mexico statute by way of special plea and answer. A writ of error brought here for review the judgment of the Supreme Court of Texas holding that the case was controlled by the Federal Employers' Liability Act, 34 Stat. 232, and refusing to give effect to the New Mexico statute—a statute which was plainly an attempted restriction upon the right of action conferred in unlimited terms by the Federal Employers' Liability Act, and, therefore, in direct conflict with that act. In deciding the question, this court said that there could be no doubt that the act of Congress "would necessarily supersede the territorial law regulating the same subject." This is broad language; but it must be construed in the light of the question presented, which was whether a territorial act, *in plain conflict with* the federal act, was valid. In that situation, the applicable rule is that formulated by Chief Justice Marshall in *Cohens* v. *Virginia,* 6 Wheat. 264, 399, where, speaking for this court, he said: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." See, also, *Humphrey's Executor* v. *United States,* 295 U. S. 602, 627, and cases cited.

In the course of the opinion rendered by this court in *Davis* v. *Beason, supra* (p. 348), it was said: "The cases in which the legislation of Congress will supersede the legislation of a State or Territory, without specific provisions to that effect, are those in which the same matter is the subject of legislation by both. There the action of Congress may well be considered as covering the entire ground." This generalization was not necessary to the decision of the case, and, taken literally, cannot stand, because, as in the *Gutierrez* case, it omits the element of actual conflict between the two acts of legislation. The decision itself sustained the validity of a statute penalizing any person who teaches, advises, counsels or encourages the practice of bigamy or polygamy, notwithstanding there was a general act of Congress which had for its object the suppression of bigamy and polygamy in the territories. And the court said in its opinion (page 341), that bigamy and polygamy are "crimes by the laws of the United States, and they are crimes by the laws of Idaho"; and further (page 348), that the act of Congress was a general law applicable to all territories and "does not purport to restrict the legislation of the Territories over kindred offenses or over the means for their ascertainment and prevention." Each of the two observations which we have last quoted, may have gone beyond the necessities of the case and may fall within the rule announced by Chief Justice Marshall in the *Cohens* case. In any event, however, they indicate that the general statement first quoted is not to be given the sweeping effect which a categorical reading of the words might at first suggest.

Only a word need be said about *Domenech* v. *National City Bank*, 294 U. S. 199, which the court below thought lent support to its judgment. That case involved the validity of a tax sought to be imposed by Puerto Rico upon a branch of a national bank organized under the

laws of the United States. We held that § 5219 of the Revised Statutes was in force in Puerto Rico and that that section forbade the tax. The grant to the territory of the general power to tax did not constitute consent on the part of Congress that a tax not authorized by § 5219 could be laid; and it is upon that ground that our decision rests. The conflict between the tax and the federal law we regarded as plain.

6. Finally, it is contended that, if the local anti-trust act and the Sherman Act both stand, a conflict of jurisdiction between the federal courts and the local courts may result. But clearly there is slight, if any, ground for the apprehension. The local act simply confers jurisdiction upon the local courts to enforce that act. No attempt, of course, is made to confer jurisdiction upon those courts to enforce the Sherman Act, or upon the federal courts to enforce the local act. It is hard to see why a conflict as to which law shall be enforced and which jurisdiction shall be invoked should ever arise, since the officers charged with the administration and enforcement of both acts are, in the last analysis, under the control of the same sovereignty and, it well may be assumed, will work in harmony.

We conclude that the anti-trust act of Puerto Rico is valid and enforceable; and, accordingly the judgment below is

*Reversed.*