**DAVID JACKSON, DUNCAN CONNOR, ALBERT BENJAMIN, and NARVEL FLEMING, for themselves and others similarly situated, Plaintiffs**

**v.**

**WEST INDIAN COMPANY, LTD., a corporation; VIRGIN ISLANDS TAXI ASSOCIATION, an unincorporated association, Defendants.**

Civil No. 1995-151

District Court of the Virgin Islands
Div. of St. Thomas and St. John

October 16, 1996

JAMES DERR, ESQ., *for Plaintiffs*

MARIA TANKENSOHN HODGE, ESQ., (HODGE & FRANCOIS), *for Defendant West Indian Company Ltd.*

RHYS S. HODGE, ESQ., *for Defendant Virgin Islands Taxi Association*

MOORE, *Chief Judge*

## MEMORANDUM OPINION

This matter is before the Court on a motion to dismiss or in the alternative for summary judgment filed by defendant West Indian

Company, Ltd. ["WICO"]. For the following reasons WICO's motion is granted in part and denied in part.

## I. Factual and Procedural Background

This suit arises from a Taxi Concession Agreement ["the 1995 Agreement"], entered into on August 3, 1995 by WICO and the Virgin Islands Taxi Association ["VITA"], which grants to VITA members the exclusive right to pick up all "independent" cruise-ship passengers from WICO's dock. Taxi drivers who are not members of VITA retain the right to pick up passengers who have arranged for pre-paid tours operated by various independent tour operators. Under the agreement, VITA is responsible for providing dispatchers and assuring that all the taxi drivers comply with the rules and regulations concerning orderly conduct, proof of insurance coverage, etc. Before the 1995 Agreement, the Taxi Concession agreements between WICO and VITA allowed all licensed taxi drivers to pick up **both** independent and pre-paid tour passengers.

David Jackson, Duncan Connor, Albert Benjamin and Narvel Fleming ["plaintiffs"], licensed taxi drivers who are not members of VITA, brought this suit on September 11, 1995. The complaint alleges that the 1995 Agreement violates the Sherman anti-trust laws (15 U.S.C. §§ 1-7), as well as the Virgin Islands anti-monopoly law (V. I. Code Ann., tit. 11, §§ 1501-1518). Plaintiffs also allege "restraint of trade in violation of public policy," "tortious interference with business relations" and violation of the Fourteenth Amendment. Finally, plaintiffs allege, against WICO only, violation of the Virgin Islands competitive bidding statute (31 V.I.C. § 235), and violation of the Commerce Clause of the United States Constitution (U.S. Const. art. I, § 8, cl. 3). This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1337(a)(commerce and antitrust regulations), as authorized by section 22(a) of the Revised Organic Act of 1954, 16 U.S.C. § 1612(a).[1]

Plaintiffs moved for a preliminary injunction on October 25, 1995 to enjoin enforcement of the new agreement, which had not gone

---

[1] The Revised Organic Act of 1954 is found at 48 U.S.C §§ 1541-1645 (1995), *reprinted in* V.I. Code Ann., Historical Documents, 73-177 (codified as amended) (1995) ["Revised Organic Act"].

into effect as scheduled on October 1, 1995 due to the arrival of Hurricane Marilyn on September 15, 1995 which caused the cancellation of all cruise ships calls to St. Thomas. Plaintiffs prayed for an injunction before the expected return of cruise ships in the beginning of November. Because a hearing could not be scheduled until November 20, 1995, the new agreement had been in effect for approximately two weeks at the time of the hearing. The Court denied plaintiffs' motion for a preliminary injunction at the end of the presentation of evidence after considering (1) the extent to which the movant would suffer irreparable harm if the injunction were denied, (2) the extent to which the nonmovant would suffer if the injunction were issued, (3) the likelihood of success on the merits by the movant, and (4) the public interest. *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 191-192 (3d Cir. 1990). A key factor in the ruling was the Court's finding that the plaintiffs would not likely succeed on the merits of their claim because WICO and VITA were most likely immune from anti-trust liability. After the hearing, WICO filed the instant motion to dismiss or in the alternative for summary judgment.

## II. Discussion

### A. Anti-trust claims

██ In their first through fifth causes of action, plaintiffs allege that the defendants' actions constitute an unlawful restraint of trade in violation of both federal and Virgin Islands anti-trust laws. It is well established that all government instrumentalities, whether state or federal, enjoy some level of immunity from anti-trust suits under the Sherman Act. Federal instrumentalities enjoy absolute immunity from anti-trust suits. *See, e.g., Sea Land Service v. Alaska Railroad,* 212 U.S. App. D.C. 197, 659 F.2d 243 (D.C. Cir. 1981), *cert. denied* 455 U.S. 919, 71 L. Ed. 2d 459, 102 S. Ct. 1274 (1982). Instrumentalities of a state or municipal government are immune where the challenged conduct is undertaken pursuant to a "clearly articulated and affirmatively expressed state policy to displace competition with regulation." *Hallie v. City of Eau Claire,* 471 U.S. 34, 40, 85 L. Ed. 2d 24, 105 S. Ct. 1713 (1985). A finding that WICO is immune from federal anti-trust liability means that WICO is also immune from liability under the local statute. See 11 V.I.C.

§ 1518 ("when the language of this Chapter is the same or similar to the language of a Federal Antitrust Law, the District Court in construing this chapter shall follow the construction given the Federal Law by the Federal courts."); *Sea Air Shuttle Corporation v. Virgin Islands Port Authority*, 782 F. Supp. 1070, 1077 (D.V.I. 1991).

This Court concludes that the more appropriate immunity doctrine is the one applicable to state governments and state governmental entities rather than the immunity doctrine applied to federal instrumentalities. This conclusion contrasts with Judge Huyett's reasoning in *Sea Air Shuttle*, which held that the Virgin Islands Port Authority was immune from anti-trust suit under both federal immunity and state action immunity doctrines. While *Sea Air Shuttle* rested its holding alternatively on the state action theory, Judge Huyett stated that "we do not believe that state action doctrine should be applied to the Government of the Virgin Islands . . . ." 782 F. Supp. at 1076, n. 10. We respectfully disagree.

*1. Federal Immunity v. State Action Immunity*

It is well established that the United States may not be sued for antitrust violations under the Sherman Act. *United States v. Cooper Corp.* 312 U.S. 600, 85 L. Ed. 1071, 61 S. Ct. 742 (1941). In *Cooper*, the Supreme Court noted that the Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade or commerce and monopolization or attempts or conspiracies to monopolize trade or commerce by any "persons." 15 U.S.C. §§ 1, 2. The Court held that Congress did not intend for the Sherman Act to expose the United States to liability and that the United States was not included in the term "persons."[2]

The prohibition against suits against the United States has been expanded to federal instrumentalities. The leading case espousing the doctrine of anti-trust immunity for federal instrumentalities is

---

[2] The issue in *United States v. Cooper*, 312 U.S. 600, 85 L. Ed. 1071, 61 S. Ct. 742 (1941), was whether the United States could bring treble damage civil actions against antitrust violators. *Cooper* held that United States was not a "person" under the antitrust laws. In 1955 Congress responded to issue raised in Cooper by adding section 4(a) to the Clayton Act, which authorizes the United States to sue alleged antitrust violators for actual, but not treble, damages. *See Sea-Land Service, Inc. v. Alaska R.R.*, 212 U.S. App. D.C. 197, 659 F.2d 243, 245 (1981). The congressional action did not disturb Cooper's holding that the United States is not a "person."

*Sea-Land Service, Inc. v. Alaska R.R.*, 212 U.S. App. D.C. 197, 659 F.2d 243 (D.C. Cir. 1981). In *Sea-Land*, the court of appeals, relying on the Supreme Court's analysis in *Cooper*, held that since the Alaska Railroad was owned and operated by the federal government, it too could not be considered a "person" under the antitrust laws. The *Sea-Land* court thus established that federal instrumentalities are outside the scope of the anti-trust laws and are absolutely immune from suit.

■ The absolute immunity afforded federal instrumentalities contrasts with the limited immunity of state and municipal instrumentalities. States, unlike the federal government, are considered "persons" for purposes of the anti-trust laws. *Georgia v. Evans*, 316 U.S. 159, 86 L. Ed. 1346, 62 S. Ct. 972 (1942). Nevertheless, the Supreme Court has held that the anticompetitive actions of states acting as sovereigns are not prohibited by the anti-trust laws. *Parker v. Brown*, 317 U.S. 341, 87 L. Ed. 315, 63 S. Ct. 307 (1943). The Court reasoned that the statutory history and language of the Sherman Act demonstrates that the Act was mainly concerned with business combinations of private individuals, and that state directed actions did not seem to fit the statutory requirement that there be a "contract, combination or conspiracy" in restraint of trade. *Id.* at 351. The Court was also concerned with federalism and adopted a rule of statutory construction that

> [i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Id.* For these reasons, state governments may not be held liable for the anticompetitive actions it may take.

■ *Parker* immunity, however, does not automatically extend to the actions of state or municipal instrumentalities. *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 394, 55 L. Ed. 2d 364, 98 S. Ct. 1123 (1978). Municipal and state agencies are immune from the antitrust laws only if the actions taken were pursuant to a

"clearly articulated" state policy. *Hallie v. City of Eau Claire*, 471 U.S. at 39. It is not necessary that the state statute granting power to a municipal or state agency "expressly state . . . that the legislature intends for the delegated action to have anticompetitive effects." *Id.* at 43. An agency is acting pursuant to a clearly articulated state policy so long as the anticompetitive conduct is a foreseeable result of the authority granted by the state. *Id.* at 44.

## 2. *Territorial Government Instrumentalities*

Since agencies and instrumentalities of territorial governments are neither state-created agencies, nor are they federal instrumentalities in the same sense as the Alaska Railroad, we must determine what immunity, if any, from antitrust laws such entities should possess. In the case of the unincorporated territories of the Virgin Islands and Guam, some courts have concluded that agencies created by the territorial governments should be treated as federal instrumentalities and thus accorded absolute immunity from antitrust liability. *See, e.g., Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285 (9th Cir. 1985); *Sea Air Shuttle Corporation v. Virgin Islands Port Authority*, 782 F. Supp. 1070 (D.V.I. 1991); *IT & E Overseas, Inc. V. RCA Global Communications, Inc.*, 747 F. Supp. 6 (D.D.C. 1990). However, in the case of the District of Columbia[3] and the unincorporated territory of Puerto Rico,[4] agencies created by those governments are treated as state-created agencies and

---

[3] The District of Columbia is governed by Congress under art. I, § 8, cl. 17 of the Constitution, whereas Congress derives its authority over the territories under Article IV, Section 3, Clause 2. The two constitutional grants of power to Congress often have been considered together and treated as having similar parameters. *See, e.g., O'Donoghue v. United States*, 289 U.S. 516, 541-42, 77 L. Ed. 1356, 53 S. Ct. 740 (1933).

[4] Puerto Rico is fundamentally an unincorporated territory, still subject to art. IV, § 3, cl. 2 of the Constitution, even though the people of Puerto Rico have entered into a compact with the Congress by which Puerto Rico has its own "constitution" and is called a "commonwealth". See Statement of the Hon. Elton Gallegly, June 26, 1996, *available in* Westlaw, Ustestimony Library, 1996 WL 374770 (during committee markup of H.R. 3024, the United States-Puerto Rico Status Act, Gallegly stated, "The 'Commonwealth' choice in the bill now accurately describes the current Commonwealth status as a territory, which is not permanent, and cannot guarantee equal benefits and rights for the people of Puerto Rico. Congress retains discretion under the Constitution's Territory Clause as to what laws apply to Puerto Rico."); *compare United States v. Sanchez*, 992 F.2d 1143, 1151 (11th Cir. 1993) (Puerto Rico is still constitutionally a territory and not a separate sovereign); *with United States v. Andino*, 831 F.2d 1164, 1168 (1st Cir. 1987) (holding that for double jeopardy purposes Puerto Rico is a separate sovereign like a state).

subject to the limitations of state-action immunity. *See, e.g., Hecht v. Pro-Football,* 144 U.S. App. D.C. 56, 444 F.2d 931 (D.C. Cir. 1971); *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Ship. Auth.,* 682 F. Supp. 1345 (E.D.La. 1988); *Caribe Trailer Systems v. Puerto Rico Maritime Ship. Co.,* 475 F. Supp. 711 (D.D.C. 1979); *Star Lines, Ltd. v. Puerto Rico Maritime Ship. Auth.,* 451 F. Supp. 157 (1978).

The court in *Sakamoto* reasoned that "since Guam is an unincorporated territory enjoying only such powers as may be delegated to it by Congress in the Organic Act of Guam, . . . the government of Guam is in essence an instrumentality of the federal government." 764 F.2d at 1286. The court of appeals cited Congress' plenary power over the territories and the fact that Congress retained the right to annul any act of Guam's legislature as supporting its characterization of the territory of Guam and by extension the Guam Airport Authority, an agency of the Guam government, as mere federal instrumentalities. *Id.* This reasoning was followed by the District Court for the District of Columbia when faced with a factually indistinguishable case relating to the telephone company in Guam. *IT & E Overseas, Inc. v. RCA Global Communications, Inc.,* 747 F. Supp. 6. Relying on *Sakamoto,* the *IT & E Overseas* court held that the Guam Telephone Authority ["GTA"], a not-for-profit public corporation, was a federal instrumentality for purposes of antitrust immunity. The opinion noted, however, that 'were this a case of first impression, the Court may well have determined that because Guam is more closely analagous to a state, GTA is not entitled to absolute immunity . . ., but rather to the qualified immunity afforded to state and local governments." *Id.* at 11-12. *Sakamoto and IT & E Overseas* were also followed by Judge Huyett in Sea Air, which found that the Virgin Islands Port Authority ("VIPA") was a federal instrumentality for the same reasons that the GTA was a federal instrumentality.

Assuming that the Virgin Islands were to be considered merely a federal instrumentality as the above line of cases might suggest, then WICO would also have to be characterized as a federal instrumentality. WICO is similar in nature to VIPA, which was created by the Virgin Islands legislature as a "body corporate and politic constituting a public corporation and autonomous governmental instrumentality for the Government of the Virgin Islands

. . . ." 29 V.I.C. § 541(a); *Sea Air*, 782 F. Supp. at 1073. The West Indian Company, Ltd. was purchased by the Government of the Virgin Islands in 1993 under Act. No. 5826, and was "granted the status and authority of a public corporation and governmental instrumentality of the Government of the Virgin Islands of the United States and shall be deemed to be a public entity operating on behalf of the Government . . . ." Act. No. 5826, § 8 (attached as Exh. A to WICO's Mem. in Opp'n to Mot. for Prel. Inj.). Thus WICO, as a government entity, would also be entitled to be absolutely shielded from operation of the antitrust laws, assuming federal action immunity applies to the Virgin Islands.

■ This Court, however, does not agree that unincorporated territories, specifically the Virgin Islands, and their agencies should be held to be mere instrumentalities of the federal government. The Virgin Islands is more analogous to a state government than to an appendage of the federal government. The Virgin Islands should at the least be afforded the same type of treatment as the District of Columbia and another unincorporated territory, Puerto Rico, which are also not states of the Union. This Court concludes that because the Virgin Islands enjoys many of the "trappings of a sovereign governmental entity,"[5] even if that sovereignty is a creation of Congress, the Virgin Islands should be treated in the same way as a state when analyzing the applicability of antitrust laws.

This analysis is founded on the well-reasoned opinion of the United States Court of Appeals for the Third Circuit, grounded solidly upon Supreme Court precedent, which held that the Virgin Islands is not a mere federal instrumentality and that the laws passed by our Legislature are not laws of the United States. *Harris v. Boreham*, 233 F.2d 110 (3d Cir. 1956) (Maris, J.). In holding that the government of the Virgin Islands is not a "federal agency" within the meaning of the Federal Tort Claims Act, the Court of Appeals concluded that it was

clear that the [government set up by Congress] in the unincorporated territory of the Virgin Islands [is] a body

---

[5] *See Ngiraingas v. Sanchez*, 858 F.2d 1368, 1371 (9th Cir. 1988), *aff'd*, 495 U.S. 182, 110 S. Ct. 1737, 109 L. Ed. 2d 163 (1990).

277

politic quite distinct from the Government of the United States and that it [has] attributes of sovereignty which [have] been delegated to it by the Government of the United States but which [are] distinct from the powers of that government.

*Id.* at 114. The Court reasoned as follows:

It is settled that Congress has sovereignty over the territories of the United States and accordingly has power to legislate for a territory with respect to all subjects upon which the legislature of a state might legislate within the state. *Simms v. Simms*, 175 U.S. 162, 168, 44 L. Ed. 115, 20 S. Ct. 58 (1899). It is also settled that Congress may delegate to a territory such of these powers as it sees fit. *Binns v. United States*, 194 U.S. 486, 491-92, 48 L. Ed. 1087, 24 S. Ct. 816 (1904); *Christianson v. King County*, 239 U.S. 356, 364-66, 60 L. Ed. 327, 36 S. Ct. 114 (1915). And the right of Congress to revise, alter and revoke these delegated powers does not diminish the powers while they reside in the territory. *Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648, 655-56, 21 L. Ed. 966 (1873); *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 106, 97 L. Ed. 1480, 73 S. Ct. 1007 (1953). The aim of Congress is to give the territory full power of local self-determination. The local laws enacted under the legislative power granted by Congress are accordingly territorial laws, not laws of the United States. *People of Puerto Rico v. Shell Co.*, 302 U.S. 253, 82 L. Ed. 235, 58 S. Ct. 167 (1937); *People of Puerto Rico v. Rubert Hermanos, Inc.*, 309 U.S. 543, 84 L. Ed. 916, 60 S. Ct. 699 (1940); *Arroyo v. Puerto Rico Transp. Authority*, 164 F.2d 748 (1st Cir. 1947).

These principles apply to the unincorporated territories, such as the Virgin Islands. For it has been held that Congress may create a territorial government for an unincorporated territory and may confer upon it an autonomy similar to that of the states. *Gromer v. Standard Dredging Co.*, 224 U.S. 362, 370, 56 L. Ed. 801, 32 S. Ct. 499 (1912); *People of Puerto Rico v. Shell Co.*, 302 U.S. 253,

260-62, 82 L. Ed. 235, 58 S. Ct. 167 (1937). And the territorial body politic thus created may be endowed with attributes of sovereignty, such as nonliability to suit without its consent. *People of Porto Rico. v. Rosaly Y. Castillo*, 227 U.S. 270, 57 L. Ed. 507, 33 S. Ct. 352 (1913). In the *Rosaly* case the Supreme Court held that Congress by the Foraker Act of 1900, had conferred such sovereignty upon what was then the unincorporated territory of Puerto Rico.

. . . .

As the Supreme Court said with respect to the Organic Act of Puerto Rico, "the purpose of Congress . . . was to follow the plan applied from the beginning to the orga- nized territories by creating a government conforming to the American system with defined and divided powers, — legislative, executive and judicial . . . ." *People of Porto Rico v. Rosaly Y Castillo*, 227 U.S. 270, 276-77, 57 L. Ed. 507, 33 S. Ct. 352 (1913).

*Id.* at 113-14.[6] Although the facts of *Boreham* arose under the 1936 Organic Act, the court noted that its ruling would be no different under the Revised Organic Act of 1954 ["Revised Organic Act"]. *Id.* at 113 n.1. In fact, the reasoning of *Boreham* applies with even more force under the Revised Organic Act, as amended, which has established an elected governor and legislature, as well as a territorial judiciary independent of the District Court of the Virgin Islands. Revised Organic Act § 22; 48 U.S.C. § 1612.

■ Under the state action immunity doctrine which the Court finds applicable to this case, WICO is only immune from liability for its action in granting an exclusive contract to VITA for the pickup of "independent" passengers if it takes such action pursu- ant to a clearly articulated policy of the Virgin Islands legislature. Therefore, WICO is immune from liability under both federal and local antitrust law if the 1995 Agreement was a foreseeable result of the authority granted by the Legislature.

---

[6]Since the Government of the Virgin Islands has an autonomy similar to that of a state, including such attributes as sovereign immunity, the statutory construction for our dual system of government is as appropriate for the Virgin Islands as it is for a state. *See Parker v. Brown*, 317 U.S. 341 at 346, 351, 87 L. Ed. 315, 63 S. Ct. 307 (1943).

■ WICO argues that its 1995 Agreement is a foreseeable result of the Legislature's authorization for WICO to "enter into contracts with any person, firm or corporation for the operation and maintenance of the Facilities . . . ." Act No. 5826, § 5. However, this legislative authorization to enter into contracts does not necessarily contemplate that WICO would enter into such an exclusive contract as the 1995 Agreement.[7] While at the time of the Government's purchase of the West Indian Company WICO and VITA were parties to a taxi concession agreement which regulated how passengers were to be picked up at WICO's dock, that agreement did not exclude any taxi drivers from picking up "independent" passengers. The failure of the Legislature to include more specific language in section 5 is not necessarily to be taken as ratification of such a preexisting concession contract. Moreover, even if it were to be so taken, the general language of section 5 cannot be taken as giving advance approval of such a more restrictive contract. We thus cannot find that the type of contract at issue here, which grants VITA the exclusive right to pick up "independent" passengers, was the type of contract that the legislature would reasonably foresee WICO would enter into. Since WICO has not met the "clearly articulated state policy" test, it is not immune from anti-trust liability under either federal or Virgin Islands law.

## B. Commerce Clause Claim

■ In their complaint, plaintiffs also allege that WICO's actions constitute a violation of the Commerce Clause. U.S. Const. art. 1, § 8. The Commerce Clause grants Congress the power "to regulate Commerce with foreign Nations, and among the several States

---

[7] WICO cites a fifth circuit case to support its contention that the clear articulation test has been met. *Independent Taxicab Drivers' v. Greater Houston Transportation*, 760 F.2d 607 (1985). *Independent Taxicab Drivers* involved a challenge to a city's grant of an exclusive contract to one taxicab company for the transportation of passengers from the city's airport. Like WICO the city was authorized to operate the airport and "enter into contracts, leases and other arrangements . . . ." Unlike WICO, however, the city was also authorized to "regulate, license and fix the charges and fares made by any person" who owns or operates taxicabs. Thus the state empowered the city with broad authority to regulate the taxicab industry and the airport. Here, WICO is simply vested with authority to enter into contracts; it is not vested with broad authority to regulate the taxicab industry.

. . . ." While the Commerce Clause is an affirmative grant of power to Congress, it has also been interpreted as a limitation on the power of the States to impede interstate commerce. *E.g., H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 534-35, 93 L. Ed. 865, 69 S. Ct. 657 (1949); *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L. Ed. 996 (1851). The negative implications of the Commerce Clause are referred to as the "dormant commerce clause".

■ Although the Commerce Clause has not been made applicable to the Virgin Islands by Congress in section 3 of the Revised Organic Act,[8] the limitations implied in the Commerce Clause have been .held to be applicable to the Virgin Islands through the Territorial Clause. *Polychrome Intern. Corp. v. Krigger*, 5 F.3d 1522, 1534 (1993). The Court of Appeals noted that "Congress has comprehensive power to regulate territories under the Territorial Clause, Art. IV, § 3, cl. 2, and that Congress' Commerce Clause powers 'are implicit' in that clause." *Id.* Accordingly, the court held that "when territorial enactments affect interstate or foreign commerce—a subject over which Congress has supreme control—those enactments must be scrutinized under Dormant Commerce Clause principles. Any other conclusion would mean that an unincorporated territory would have more power over commerce than the states possess." *Id.* (internal quotations and citation omitted).

■ Applying dormant commerce clause principles to WICO's actions demonstrates that WICO has not violated the Commerce Clause. "The primary purpose behind the Commerce Clause is to ensure that 'our economic unit is the Nation' rather than individual states." *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 399 (3d Cir. 1987) (citation omitted). A state action that constitutes "simple economic protectionism" and discriminates against out-of-state interests or in favor of in-state interests is subject to a heightened level of scrutiny under the Commerce Clause and is most likely to be declared unconstitutional. *Id.* at 399-400. However, actions

---

[8]Such "non-fundamental" provisions of the Constitution are applicable to an unincorporated territory only to the extent Congress makes them applicable. *Downes v. Bidwell*, 182 U.S. 244, 266-67, 45 L. Ed. 1088, 21 S. Ct. 770; *Balzac v. Porto Rico*, 258 U.S. 298, 312-13, 66 L. Ed. 627, 42 S. Ct. 343; *cf. Dorr v. United States*, 195 U.S. 138, 145, 149, 49 L. Ed. 128, 24 S. Ct. 808.

which do not discriminate against, but rather have only an incidental effect on, interstate commerce, are governed by a balancing test, under which the state conduct is "invalid only if the incidental burden on interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* at 399.

■ There is no burden on interstate commerce when the challenged action affects in-state as well as out-of-state interests equally. As the Court of Appeals stated,

> the "incidental burden on interstate commerce" appropriately considered in Commerce Clause balancing is the degree to which the state action incidentally discriminates against interstate commerce relative to intrastate commerce. It is a comparative measure. There conceivably is language suggesting that any increased costs imposed on out-of-state interests, in an absolute sense, are relevant burdens regardless of whether the same costs are imposed on in-state interests. However, we find that the holdings of the Supreme Court case law, consistent with the anti-protectionism purpose of the Commerce Clause, apply the much narrower comparative burden concept. As earlier noted, virtually all state regulation involves increased costs for those doing business with the state, including out-of-state interests doing business in the state as well as in-state interests. . . . Where the "burden" on out-of-state interests is no different from that placed on competing in-state interests, however, it is a burden on commerce rather than a burden on interstate commerce.

*Id.* at 406.

■ WICO's 1995 Agreement granting VITA the exclusive right to pick up "independent" cruise-ship passengers at WICO's dock is a nondiscriminatory burden affecting all taxi operators, whether those operators are Virgin Islands businesses or not. This case is similar to one decided in Pennsylvania. *Pa. Coach Lines, Inc. v. Port Authority of Allegheny*, 874 F. Supp. 666 (W.D.Pa. 1994). In *Pa. Coach Lines*, a transportation carrier sued the port authority for granting to another company the exclusive right to transfer passengers from

the airport to certain locations. The court noted that this burden affected all carriers regardless of state affiliation, and thus did not violate the commerce clause. *Id.* at 670. Similarly, the burden on taxi cab operators under the 1995 Agreement is a burden on all taxi cab operators regardless of whether the operators are Virgin Island operators or non-Virgin Island operators.

While the 1995 Agreement is not a burden on interstate commerce with respect to taxicab operators, it may be argued that it results in burdening interstate and foreign travelers. The court in *Pa. Coach Lines* noted that "even if plaintiff construed defendant's resolution [the grant of the exclusive right] as a burden on out-of-state travelers—assuming plaintiff has standing to argue this point—the burden would still be nondiscriminatory because in-state travelers would also 'suffer' from the resolution." *Id.* at 670 n.4. In the context of picking up cruise ship passengers, it is difficult to distinguish between intrastate and interstate commerce given that passengers' visits to St. Thomas are just one stop on interstate — even international — journeys. However, even assuming the 1995 Agreement represents a burden on interstate commerce because of the impact on interstate travelers, and assuming that plaintiffs have standing to argue such a point, that burden is not so substantial and unreasonable that it violates the Commerce Clause. There is precedent for the proposition that an exclusive agreement for the provision of taxicab services in the Virgin Islands is a substantial and unreasonable burden on interstate commerce and thus violative of the Commerce Clause. *Southerland v. St. Croix Taxicab Association*, 315 F.2d 364 (3d Cir. 1963). The facts of the case before us, however, differ significantly from those in *Southerland* and do not violate the rule of that case.

In *Southerland,* the Government of the Virgin Islands granted one taxicab association the exclusive right to pick up passengers at the St. Croix airport. As a result, the plaintiff was prohibited from picking up passengers whom he had contracted to transport to their hotels, pursuant to a prearranged package tour. The Court of Appeals held that such an agreement unduly burdened interstate commerce and was in violation of the Commerce Clause. Significantly, the agreement between WICO and VITA does not prohibit those taxicab drivers who work for tour operators from picking up

those passengers who have signed up for the tours. Indeed, the amount of business generated by pre-paid package tours constitutes a majority of the business generated by the cruise ship arrivals. Edward E. Thomas, the president and chief executive officer of WICO, testified at his deposition that the number of passengers traveling on pre-paid package tours versus passengers hiring taxi drivers independently increased from 20 percent in 1991 to over 50 percent in 1994. (Dep. Tr. at 14). Moreover, uncontradicted testimony at the preliminary injunction hearing indicated that for some ships that arrive, over 70 percent of the passengers have signed up for pre-paid tours. Edward Thomas also noted that at times taxis who waited in the feeder lines to pick up independent passengers would end up receiving no fares. This was corroborated by testimony of plaintiff's witnesses at the hearing. Accordingly, the fact that the 1995 Agreement restricts who can pick up independent passengers does not unduly burden interstate commerce under these circumstances, as a matter of law.

## C. Fourteenth Amendment Claim

In plaintiffs' eighth cause of action, they allege that "the actions of WICO were and are arbitrary, capricious and unlawful, are not rationally related to any legitimate state interest and constitute a deprivation of Plaintiffs' rights to substantive and procedural due process and to equal protection of the law in violation of the Fourteenth Amendment . . . ."[9] WICO asserts that plaintiffs should be deemed as having abandoned that claim, because plaintiffs did not argue or rely on it at the hearing on the motion for preliminary injunction. In the alternative, WICO argues that plaintiffs have not been denied any due process of law or equal protection. This Court does not agree that plaintiffs have abandoned this claim, as they do discuss it briefly in their memoran-

---

[9]The second sentence of section one of the Fourteenth Amendment is applicable to the Virgin Islands. Revised Organic Act § 3; 48 U.S.C. § 1561. That sentence reads in full:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Amend. XIV, § 1.

dum of points and authorities in support of the motion for preliminary injunction. However, we agree with WICO that plaintiffs have not been denied any procedural or substantive due process or equal protection of the law.

## 1. Equal Protection Claim

Plaintiffs allege that WICO's actions represent a violation of plaintiffs' right to equal protection of the laws. When neither a fundamental right nor a suspect class is involved, a state's action is constitutional so long as it is rationally related to a legitimate state interest. *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 49 L. Ed. 2d 511, 96 S. Ct. 2513 (1976). Plaintiffs do not allege either that they are a suspect class or that a fundamental right is involved.

Under this rational basis test, WICO has clearly shown that there were legitimate reasons underlying the adoption of the 1995 Agreement. Evidence presented at the preliminary injunction hearing demonstrated that, before the agreement, there were several problems with discipline and compliance with WICO's rules and regulations by the taxi cab drivers. Although the evidence did not demonstrate whether the problems were primarily caused by the non-VITA member taxi drivers or by VITA member taxi drivers, it is clear that substantial problems existed. The evidence at the hearing, as well as from Edward Thomas' deposition, indicated that since the new agreement had gone into effect until the time of the hearing, WICO had had no difficulties with taxi drivers complying with their rules and regulations. Thomas testified that since the agreement went into effect, "it is the best this dock has ever operated." (Tr. Dep. at 20.) WICO noted that tourism is vital to St. Thomas' economy and that it is therefore in the public interest to ensure that tourists have a pleasant experience when greeted by taxi drivers upon exiting the cruise ships. We agree that ensuring orderly and efficient taxi service at the cruise docks is a legitimate goal that the 1995 Agreement is rationally related to, and thus any claim premised upon the Equal Protection Clause of the Fourteenth Amendment must fail.

## 2. Substantive or Procedural Due Process

In order for the plaintiffs to state a claim under the Due Process

Clause, they must establish that some protected property or liberty interest is implicated by the challenged action. Plaintiffs do not specify what constitutional property or liberty interest is at stake. The only interest at issue in the complaint is plaintiffs' interest in being able to pick up "independent" cruise ship passengers from WICO's dock. However, this interest does not rise to a constitutional right that is protected by the Fourteenth Amendment.

The Fourteenth Amendment guarantees that no person may be deprived of life, liberty or property without due process of law. U.S. CONST. amend. XIV, § 1. A person may acquire a property interest in a government entitlement or benefit which may not be taken away absent due process. *Board of Regents v. Roth*, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); *Molloy v. Monsanto*, 30 V.I. 164, 173 (D.V.I. 1994). Whether a benefit constitutes a property interest is a question of state or local law. 408 U.S. at 577. In this case, plaintiffs cannot point to any local law or regulation which grants them a protected right to pick up passengers at WICO's dock. Simply because it was the past practice of WICO to allow all taxi cab operators to pick up all passengers does not convert the plaintiffs' expectation that such a practice would continue into a protected property interest. As the Supreme Court in Roth noted, "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." *Id.* The plaintiffs have alleged nothing more than a desire for WICO's past practice to continue, and cannot allege that such a wish rises to the level of a property interest.

Liberty interests are also protected by the Fourteenth Amendment. The opportunity to pursue one's livelihood is a constitutionally protected liberty interest that may not be arbitrarily denied. *Piecknick v. Com. of Pennsylvania*, 36 F.3d 1250, 1259 (3d Cir. 1994) ("The right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the 'liberty' and 'property' concepts of the Fifth and Fourteenth Amendments."); *Cowan v. Corley*, 814 F.2d 223, 227 (5th Cir. 1987). Plaintiffs' complaint could be construed as alleging a deprivation of their liberty interest in pursuing their chosen profession.

Viewing the complaint as alleging a liberty interest and viewing the alleged facts in a light most favorable to the plaintiffs, we

conclude that the 1995 Agreement does not deprive plaintiffs of their right to follow their chosen profession. As discussed above, the 1995 Agreement allows plaintiffs to pick up pre-paid tour passengers, a significant portion of taxicab business at the dock. Furthermore, the 1995 Agreement only concerns taxi service at the WICO dock and has no impact on taxicab operators' ability to pursue fares at other locations on the island. This case is similar to *Piecknick* where the Court of Appeals held that allowing another towing company to provide towing services in the zone previously serviced exclusively by the plaintiff was not "an unreasonable interference with [plaintiff's] right to pursue its chosen occupation." 36 F.3d at 1261. *See also Durham v. Jones*, 698 F.2d 1179, 1181 (11th Cir. 1983) (per curiam) (sheriff did not affect towing company's right to operate towing service or ability to perform towing for other law enforcement agencies where it refused to place towing service on call list). "It is the liberty to pursue a particular calling or occupation and not the right to a specific job that is protected by the Fourteenth Amendment." 36 F.3d at 1262.

## III. Conclusion

In summary, this Court finds that WICO is not immune from antitrust liability because WICO's actions cannot be said to have been taken pursuant to a clearly articulated policy of the Virgin Islands legislature and WICO's motion to dismiss Counts one through five of the plaintiff's complaint will be denied. Regarding the plaintiff's Commerce Clause claim, there are no factual issues of genuine material dispute and WICO is entitled to judgment as a matter of law. This Court will also dismiss plaintiff's eighth cause of action premised on the Fourteenth Amendment, because plaintiffs have not asserted any deprivation of any constitutionally protected property or liberty interests or denial of equal protection of the laws. Finally, this Court will deny without prejudice WICO's motion for summary judgment with respect to plaintiff's claim for "tortious interference with business relations" and for violation of the Virgin Islands bidding statute as such claims have not been fully argued or briefed.

ENTERED this 16 day of October, 1996

## ORDER

For the reasons set forth in the accompanying memorandum, it is hereby

ORDERED that WICO's motion for summary judgment as to Counts One through Five of plaintiff's complaint is DENIED; and it is further

ORDERED that WICO's motion for summary judgment as to Count Seven (Violation of the Commerce Clause) is GRANTED; and it is further

ORDERED that WICO's motion to dismiss Count Eight (Violation of Fourteenth Amendment) is hereby GRANTED; and it is further

ORDERED that WICO's motion for summary judgment as to Count Six (Tortious Interference with Business Relations) and Count Nine (Violation of 31 V.I.C. § 235) is DENIED without prejudice.

ENTERED this 16th day of October, 1996