Douglas A. KEPLER, and Eric C. McCleary, trading as Damariscotta, Plaintiffs,

v.

Javed MIRZA, individually and in his official capacity as District Mining Manager of the Pennsylvania Department of Environmental Protection; Ernest Giovannitti, individually and in his official capacity as the Director of the Bureau of Mining and Reclamation of the Pennsylvania Department of Environmental Protection; and, James E. Sief, individually and in his capacity as the Secretary of the Pennsylvania Department of Environmental Protection, Defendants.

Civil Action No. 96–61.

United States District Court, W.D. Pennsylvania.

March 31, 1999.

Joseph Altomare, Titusville, PA, for Plaintiffs.

Gloria A. Tischuk, Charles B. Schweitzer, for Defendants.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiffs Eric C. McCleary and Douglas A. Kepler, members of the partnership Damariscotta, bring the instant civil action under 42 U.S.C. § 1983 against Defendants Javed Mirza, Ernest Giovannitti and James E. Sief, both in their individual capacity and in their capacity as employees of the Pennsylvania Department of Environmental Protection. McCleary and Kepler allege that the Defendants deprived them of their Fourteenth Amendment right to pursue their chosen occupation.

Presently pending before the court are a motion to strike the affidavit of Kepler and a motion for summary judgment, both filed by the Defendants. For the reasons set forth below, the Defendants' motion for summary judgment is granted. The Defendants motion to strike Kepler's affidavit is denied as moot given that the affidavit was amended and Defendants did not object to the amended document.

### I. BACKGROUND

#### 1. The Parties

The Pennsylvania Department of Environmental Protection ("Department" or "DEP") is an administrative agency of the

Commonwealth of Pennsylvania charged with the duty to administer and enforce state environmental laws, including the Surface Mining Conservation and Reclamation Act, 52 Pa.Code §§ 1396.1–1396.19a (1998). Its regulatory scheme for undertaking this duty includes provisions for licenses, permits, bonds, performance standards, and enforcement. *See* 52 Pa. Code § 1396.4 (1998); 25 Pa.Code §§ 86.1 to 87.209 (1998). The Department is divided into six divisions including the Northwest Regional Office which is commonly referred to as the Knox District Mining Office.

All three Defendants are employees of the DEP. Defendant Javed Mirza is the District Mining Manager of the Knox District and has final authority in all permit and enforcement matters which affect the District's mining industry. Mirza depo. at 17–18. Defendant Ernest Giovannitti is the Director of the Department's Bureau of Abandoned Mine Reclamation. Giovannitti depo. at 8–9. He establishes operating policy and administers, supervises, evaluates and monitors the activities of the Bureau to insure compliance with applicable federal and state law. Finally, Defendant James E. Sief is the Secretary of the Pennsylvania Department of Environmental Protection.

Plaintiffs Kepler and McCleary are the sole partners of Damariscotta, a general partnership engaged in ecological restoration of acid mine drainage sites. Kepler amend. aff. ¶ 2. Basically, they design passive treatment systems for acid mine drainage and then oversee the construction of those systems. Kepler depo. at 9–11. They subcontract with engineers, draftsmen, geologists, hydrologists, and earth moving companies. *See id.* at 6. According to Plaintiff Kepler, the primary emphasis of their business is "on applied research and development of passive technologies capable of abating metal contaminated acid mine drainage" while the secondary emphasis of the company is "natural wetland work as well as delineations, mitigations, stream survey work from time to time, [and] environmental assessments." *Id.* at 9–10.

Plaintiffs are somewhat well known in the field of passive treatment.[1] *See id.* at 11. They have developed new technologies in the field, including the Successive Alkalinity Producing System ("SAPS"), and have published, given presentations and written government manuals regarding the implementation of passive treatment systems. *See id.*

### 2. The Relationship Between the Parties

The Plaintiffs work for coal and mining operations, bonding companies (sureties) that issue bonds to the coal and mining operations, environmental groups and environmental agencies like the DEP. *See id.* at 24–26. In essence, their job is to design an acid mine drainage plan that will be approved by the DEP and then oversee the construction of the plan. *See id.* at 9–11.

Before a licensed coal or mining operator[2] may engage in surface mining activities, it must obtain a permit from the local District Mining Office[3] for each separate mining operation. *See* 52 Pa.Code § 1396.4 (1998). The permit is to ensure restoration of the site after completion of the mining. Its application is very detailed; the permittee must submit sur-

---

**1.** Passive treatment is defined as "a means of treatment that incorporates [the] biological, chemical, and physical aspect of treatment in such a manner that you don't have a regular day-to-day operation of the system." Kepler depo. at 11.

**2.** The Surface Mining Act requires that one wishing to mine coal must first obtain a license from the Department of Environmental Protection. *See* 52 Pa.Code § 1396.3a (1993). Then, as explained in the body of this opinion, it must obtain a permit from the Department for each site it wishes to mine. *See* 52 Pa. Code § 1396.4 (1998).

**3.** The coal or mining operation must apply to the district office where the site is located. Mirza depo. at 10.

veyed maps, specifications, design analysis, test reports, and a reclamation[4] plan. *See id.* To meet this requirement, the permittee retains an entity like the Plaintiff or one of its competitors to design a plan for submission to the DEP for approval. If the plan is approved, the designer oversees the construction of the system. Kepler depo. at 9–11. The plan must be specific; it must detail the manner in which the land will be restored as well as the way in which it will avoid acid mine drainage. *See* 52 Pa.Code § 1396.4(a)(2) (1998). It must also set forth a timetable for completion and an itemized list of costs. *See id.* Further, Department regulations set forth very specific standards that must be met by the surface mining operations, *see* 25 Pa.Code § 87.91–.167 (1998), so that it is important for the plan to address and meet these standards. They include effluent standards for any water discharge from the site and other provisions which govern the reclamation work. *See id.*

The Surface Mining Act also requires that the company seeking the permit "file with the department a bond for the land affected by each operation." 52 Pa.Code § 1396.4(d) (1998); *see* 25 Pa.Code §§ 86.141–.190 (1998). The bond assures either reclamation of the site or that the state will have the money to complete the reclamation if the permittee does not. *See id.* The Department retains the bond until the coal operator complies with the terms of its permit; only then will the bond be released. *See* 52 Pa.Code § 1396.4(h) (1998); 25 Pa.Code §§ 86.180–.190 (1998). If the permittee does not comply, the bond will be declared forfeited by the Department and the amount will be paid over to the Department. *See id.*

The scenario changes slightly when the permittee uses a bond company or corporate surety. Then, upon forfeit by the Department, the corporate surety "shall

have the option of reclaiming the forfeited site" or paying the amount of the bond to the department. 52 Pa.Code § 1396.4(h) (1998). The corporate surety can only exercise its option to reclaim instead of pay out, however, by submitting a reclamation proposal to the DEP and gaining DEP's approval. *See id.* In this case, companies like the Plaintiff are retained by the surety to propose a plan for DEP's approval.

Ultimately, all reclamation plans must be approved by the District Mining Office of the DEP. Mirza depo. at 17–18. In Knox, final approval rests with Javed Mirza. *See id.* He is also responsible for supervising the District Mining Office's staff which includes three sections—the administrative support section, the permitting/technical section, and the compliance section. *See id.* Mirza's decision can be appealed, however. The Surface Mining Act provides that a coal operator or surety may appeal the Department's plan-related determination to the Environmental Hearing Board. *See* 52 Pa.Code § 1396.4(i) (1998). It also provides that any person who has an interest in the DEP's determination may file suit in the Court of Common Pleas to compel compliance with the law. *See* 52 Pa.Code § 1396.18c (1998).

Moreover, even if the bond is ultimately forfeited to the Department, companies like the Plaintiff may still have some involvement in the reclamation. While the funds forfeited will be held by the State Treasurer in the Surface Mining Conservation and Reclamation Fund ("Reclamation Fund"), *see* 52 Pa.Code § 1396.18 (1998), the Department's Bureau of Abandoned Mine Reclamation ("BAMR"), directed by Defendant Ernest Giovannitti, oversees the use and distribution of the funds by ensuring that they are used to reclaim the land on which the bond is posted. *See* 52 Pa.Code § 1396.18(b) (1998); 25 Pa.Code § 86.187 (1998). The

---

4. The parties bicker about whether the term reclamation or remediation applies to the treatment of acid mine drainage. It is clear that reclamation includes the treatment of acid mine drainage, *see* 52 Pa.Code § 1396.4(a)(2) (1998); whether that treatment is called reclamation or remediation is of no moment.

Bureau seeks bids for reclamation work on the forfeited bond sites; it has the authority to award grants to municipalities and nonprofit organizations from money in the Reclamation Fund. *See* 52 Pa.Code § 1396.18(j) (1998). It can also grant money from funds which it receives pursuant to Section 319 of the Federal Clean Water Act, 33 U.S.C. § 1329 (1998). Section 319 provides for distribution of funds to the states to be used as grants for remediation of waterways. *See id.* Companies like the Plaintiff can be the beneficiary of these funds if they are hired by the municipalities or nonprofit organizations to design the reclamation projects or if they contract with the DEP to perform the remediation of the waterways.

### 3. Damariscotta and Mirza—Facts Relating to Deprivation of Liberty Interest

Plaintiffs essentially contend that their deprivation of liberty interest claim is factually supported by Mirza's hostile conduct toward them and by his denial of the reclamation plans they have proposed. They allege that he threatened to drive them out of business, was verbally abusive on a number of occasions and deliberately brought one of their competitors into the Knox market. Further, they point to Mirza's denial of their reclamation plans for the Glacial, Hanley Brick and C & K Coal sites and the fact that they have not since been hired by any sureties or coal companies within the Knox district.

In early 1993, Glacial Minerals, Inc. ("Glacial"), a coal company, ceased its operations, leaving twenty-eight sites in the Knox District (Mirza's district) unremediated. As a result, CIGNA and Utica, the sureties for Glacial, were faced with the option of remediating the sites themselves

or forfeiting the amount of the bond. Miller depo. at 33–34. Both decided to remediate and in order to develop a plan to submit to the DEP, they hired the Plaintiffs. *See id.*

In May of 1994, the Plaintiffs completed their plan and the sureties submitted it to Mirza. Kepler amend. aff. ¶ 11; Pls exhs. 5 & 6. The plan called for the remediation of all twenty-eight sites in conformance with regulatory standards, except for the manganese requirement, which Plaintiffs proposed to treat using the "best available technology." *See id.* It was the Plaintiffs' understanding that the DEP had a policy of not strictly enforcing the regulatory standard for manganese. *See id.* However, Mirza rejected the plan due to the manganese deficiency and began forfeiture proceedings on all of the bonds. Kepler amend. aff. ¶ 11. By October, the Knox office declared the entire amount of the bonds forfeited. Def. exh. C.

CIGNA and Utica appealed the forfeitures and began settlement discussions with the DEP. Def.'s exh. C. Subsequently, a settlement was reached and approved by the Environmental Hearing Board. *See id.* The settlement provided that the sureties would pay 3.1 million dollars in bond forfeitures and would be released from their obligation to remediate twenty-five of the twenty-eight sites. *See id.* They would still be required to remediate the remaining three sites—Strattanville, Reed and Morrison. *See id.* Thereafter, the Plaintiffs approached Mirza in order to learn the reasoning behind his decision to reject the plan. Kepler amend. aff. ¶ 13; Kepler depo. at 111–12. Mirza met with Kepler but allegedly became abusive and threatened to destroy the Plaintiff's business if they interfered in any way with his decision.[5] Kepler depo. at 127–32. He

---

5. Plaintiffs also claim to have been threatened by Mirza in the fall of 1993. Mirza had refused to approve a remediation plan Damariscotta developed for REM Coal Company unless Plaintiffs guaranteed to him in writing that they would meet the manganese standard. He told them that if they did not make

the guaranteed, "he would there and then pick up the phone and cause the personal home of REM's owner to be taken." Kepler amend. aff. ¶ 14; Kepler depo. at 127–32. The home was pledged by the owner to the surety company.

also threatened to cut off the Mill Creek Coalition, an environmental group, from financial assistance when he heard of their reservations concerning his decision. Kepler amend. aff. ¶ 15. Plaintiffs decided not to challenge the decision based on the advice of sureties who feared that their own interests would be disrupted by such a challenge. Kepler depo. at 110–11.

In the fall of 1994, the Plaintiffs attended an acid mine drainage conference in West Virginia where they encountered and approached Terry Fabian, the DEP's Deputy Director for Mining and Defendant Giovannitti. Kepler amend. aff. ¶ 18; Kepler depo. at 191–98; Fabian depo. at 14–19. They again tried to learn the reasoning behind Mirza's decision but before they could, Mirza allegedly entered the room and began angrily screaming epithets including that McCleary and Kepler were liars. Kepler amend. aff. ¶ 18; Kepler depo at 193–98. As a result, the meeting with Fabian and Giovannitti ended abruptly. Kepler amend. aff. ¶ 18.

Subsequent to the conference, Plaintiffs claim that Mirza made it clear to their only competitor within all of western Pennsylvania, Robert Hedin, that he wanted to disrupt the Plaintiff's business, and asked Hedin to start doing work within the Knox district. Hedin depo. at 129–31. Meanwhile, the Plaintiffs met with Robert Dolence, the Deputy Secretary for Mining, and relayed to him their concerns. Kepler amend. aff. ¶ 20. Dolence told them that it was unlikely their concerns would be addressed because "Mirza is a money getter" for the DEP; he told them they had to understand that "money is power." Kepler amend. aff. ¶ 20.

The Plaintiffs were also hired by Hanley Brick, Inc. ("Hanley"), the owner of a clay mine in the Knox district, to design a plan to remediate an acid mine drainage. *See id.* ¶ 21. Plaintiffs decided the Hanley discharge was unique and it would be impractical to discharge in compliance with the point-source standards that the DEP's regulations required. *See id.* ¶ 22. Thus,

their plan was to treat the Hanley discharge below regulatory standards, but also to treat several downstream charges, the result of which would be an alleged substantial reduction in the total effluent loan on the stream. *See id.*

Plaintiffs recognized that their plan did not meet the required effluent standards which were measured at the point of discharge and sought to be freed from those strict standards. *See id.* ¶ 23. Kepler contacted legal counsel for the DEP and sought an opinion as to the legality of the plan. On May 12, 1995, Kepler, State Representative Samuel Smith, who was enthusiastic about the Damariscotta approach, and Mirza, Bill Allen, Bill Hellier and Lori Odenthal from the DEP visited the Hanley site. *See id.* ¶ 27. They discussed the Damariscotta proposal and when Representative Smith asked what a SAPS was, Mirza allegedly replied that it meant "shit on stone." *Id.* ¶ 27.

On June 2, 1995, a meeting was attended by the Plaintiffs, Dolence, Paul Linannd, Director of District Mining Operations, Giovannitti, Mirza, National Mine Land Reclamation Center representatives and the Pennsylvania Fish Commission. *See id.* ¶ 23. According to the Plaintiffs, those attending approved of the plan but suggested that the Plaintiffs should try to further determine the beneficial effect that it would have on the stream and aquatic life. *See id.* However, in a letter dated June 28, 1995, Mirza formally rejected the plan and Hanley began negotiating a solution with Mirza without the Plaintiffs involvement. Pls. exh. 4. Eventually, Hanley and the DEP entered into a Consent Decree whereby Hanley would pay 2.4 million dollars into a trust in return for its release from the obligation to treat the discharge according to effluent standards. Def. exh. E.

Subsequent to Mirza's rejection of the Hanley plan, Kepler wrote a letter to Mirza in which he voiced his displeasure with the DEP's position. Mirza wrote back

622

asserting that Kepler's letter was inaccurate and counterproductive. He also stated the following:

> If you would like to participate in the Hanley Brick discussions in the future, I suggest that you coordinate more closely with your client's position and communicate through your client, and do so in a more positive manner. We are striving to make a distant opportunity become a reality which benefits the Redbank watershed and the citizens of the Commonwealth. Your talents, if applied constructively, could be a valuable asset in achieving this goal.

Letter from Mirza dated Oct. 20, 1995.

Plaintiffs also point to their experiences with C & K Coal and Mirza. In August of 1994, C & K Coal filed an application for the release of its bond. Mirza depo. at 30. Mirza's own staff suspected that an acid mine drainage was hydraulically linked to the C & K mining site. *See id.* at 31. A citizens organization named the Mill Creek Coalition had the same concerns and voiced them to Mirza. *See id.* at 48. Allegedly, if their concerns were true, then the Surface Mining Act would dictate the bond not be released. Pls. brief at 11. Nevertheless, Mirza approved the application. Mirza depo. at 53. He informed the Mill Creek Coalition that C & K agreed to donate $50,000 which Mill Creek could use to remediate the offsite discharge. Mirza depo. at 45–77. He also allegedly taunted the Plaintiffs, telling them that he was convinced they would have to design the remediation for free. Kepler depo. at 179–81. Again, the plaintiffs did not appeal the bond release; instead, they submitted a bid to perform the remediation. Kepler amend. aff. ¶ 30. However, they ultimately lost the bid. *See id.*

Plaintiffs also had another experience with Mirza and C & K Coal. C & K asked Kepler and McCleary to design passive treatment systems for a number of sites within the Knox district. Kepler amend. aff. ¶ 32. The Plaintiffs agreed to do so but because of the size of they project,

they had to enlist their chief competitor, Hedin, to assist them. *See id.* However, subsequent to Mirza's alleged threat to destroy Plaintiffs' business, Plaintiffs were eliminated from the proposal and Hedin designed it alone. Kepler amend. aff. ¶ 32; Hedin depo. at 132–33, 141–42.

Plaintiffs claim that there is record evidence which creates a material issue of fact as to whether Mirza unwarrantedly interfered and thereby impaired or damaged their right to pursue their profession. Plaintiffs contend that since the threat, they have not been hired by any sureties or permittees within the Knox district. Further, they contend that Giovannitti and Sief should be subject to supervisory liability since they allegedly knew of Mirza's conduct and took no action. The Defendants disagree. They argue that Plaintiffs have failed to demonstrate an injury in this case in that they have not been deprived of their right to pursue their occupation.

## II. STANDARD OF REVIEW

The movant is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." F.R.Civ.P. 56(c). "This rule allows parties to demonstrate prior to trial that opposing claims have no factual basis." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The inquiry here is "whether there is any need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Celotex,* 477 U.S.

at 323, 106 S.Ct. 2548. Thereafter, the burden shifts to the non-moving party to demonstrate that there is a genuine issue for trial. *See* F.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### III. Discussion

In order to succeed on a claim under Section 1983 of title 42, a plaintiff must show that the defendant (1) deprived him or her of rights, privileges or immunities secured by the Constitution or laws of the United States while (2) acting under color of state law. *See* 42 U.S.C. § 1983 (1994 & Supp.1998); *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250, 1255–56 (3d Cir.1994) (quoting *Carter v. City of Philadelphia,* 989 F.2d 117, 119 (3d Cir. 1993)). Plaintiffs' section 1983 claim here is that they have been deprived of a liberty interest under the Fourteenth Amendment, namely, the right to pursue their occupation. Defendants have moved for summary judgment and argue that Plaintiffs have failed to provide evidence that they were deprived of a constitutionally protected liberty interest.

In *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250 (3d Cir.1994), the Third Circuit explained that "[t]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the 'liberty' and 'property' concepts of the Fifth and Fourteenth Amendments." *Id.* (citing *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)). In order to state a section 1983 claim for deprivation of the liberty interest, a plaintiff must show state action that significantly altered or denied him or her the opportunity to pursue a particular calling or occupation. *See id.* "It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Id.* (quoting *Bernard · v. United Township High Sch. Dist. No. 30,* 5 F.3d 1090, 1092 (7th Cir.1993)) (internal quotations omitted).

The threshold issue in this case is whether, viewing all inferences in the light most favorable to the Plaintiffs, the Plaintiffs' liberty to pursue a calling or occupation has been unreasonably interfered with or eliminated by the conduct of the Defendants. More specifically, has the alleged state action merely curtailed the Plaintiff's occupational liberty or has it unreasonably interfered with or deprived them of that liberty?

Plaintiffs claim that since Mirza's threat to destroy their business, they "have been effectively ostracized from plying their profession within the [Knox] district." Pls brief at 30. They explain that since then, "with the exception of their continuing work on behalf of the Glacial sureties with respect to the only two sites approved for passive treatment by Mirza prior to November of 1994, Plaintiffs have been unable to obtain any work in the Knox district which in any respect required the approval of Mirza." *Id.* Specifically, Plaintiff Kepler, in his affidavit, states:

> While Plaintiffs continue to be retained by the Glacial sureties in connection with 1 of the 28 original AMD sites (Morrison), since complaining to Mirza that his decision would leave 25 sites unremediated, and the resulting threat against their business made by him, Plaintiffs have since not been retained by an[y] surety or permittee in connection with any AMD site whose remediation requires approval by the Knox district.

Kepler amend. aff. ¶ 33.

Defendants cite to various projects that Plaintiffs are currently working on including work for five different coal companies as well as the Morrison remediation. Plaintiffs counter that they do not have to show they were completely barred from

the profession. Rather, they argue, they only have to show "governmental activity which unwarrantedly 'interferes' and thereby impairs or damages an individual's right to pursue his profession." Pls brief at 21.

In *Piecknick* and subsequently in *Latessa v. New Jersey Racing Commission*, 113 F.3d 1313 (3d Cir.1997), the Third Circuit addressed this question. The plaintiffs in *Piecknick* were operators of a tow truck company who filed a section 1983 claim against the State Police. They alleged that the police had a policy which divided the county into specific zones so that only one towing company would be called upon to remove vehicles from accident scenes in their zone. Piecknick was assigned to Zone 1 but according to it, the State Police began referring towing in that zone to a competitor who was supposed to be limited to Zone 2. Thus, the plaintiffs' claim was that by allowing the competitor to tow in their zone, the State Police deprived it of the right to pursue its occupation.

The plaintiff in *Latessa* alleged a similar claim. He was a racing judge licenced by the United States Trotting Association to officiate at harness horse meets. In 1992, he was appointed Presiding Judge at the Meadowlands Race Track in New Jersey. However, a year later, after the Executive Director of the New Jersey Racing Commission became upset at him for not advocating the suspension of a horse trainer, Latessa was denied reappointment. Like Piecknick, Latessa alleged that the non-reappointment denied him of his right to pursue his occupation.

In both cases, the Third Circuit stressed that "[i]t is the liberty to pursue a particular calling or occupation and not the right to a specific job that is protected by the Fourteenth Amendment." *Piecknick*, 36 F.3d at 1262; *see Latessa*, 113 F.3d at 1318. The court held in *Piecknick* that the plaintiff did not have a liberty interest that was protected by the Fourteenth Amendment because although it was the practice of the State Police for the previous four years to limit the towing in Zone 1 to Zone 1 operators, adding a Zone 2 operator was not an unreasonable interference with the plaintiff's right to pursue its chosen occupation. *See Piecknick*, 36 F.3d at 1261. The court indicated that the case was clearly distinguishable from cases "in which a person's license to pursue a chosen occupation is revoked or substantially interfered with." *Id.* The same result followed in *Latessa*. The court there held that Latessa did not offer evidence of unsuccessful attempts to secure employment in his occupation following non-reappointment and offered no support for his claim that he was unreasonably restricted in his ability to pursue that occupation. *See Latessa*, 113 F.3d at 1318. In fact, the court stated, there was evidence that he worked as a judge at other tracks, including one in Maryland. *See id.*

A district court in this circuit has also addressed this issue. In *Jackson v. West Indian Company*, 944 F.Supp. 423 (D.Vi. 1996), West Indian Company and the Virgin Islands Taxi Association entered into an agreement which granted the taxi association members the exclusive right to pick up all independent cruise ship passengers from West Indian Company's dock. The plaintiffs, licensed taxi drivers who were not members of the taxi association, filed suit alleging that because of the agreement, they were deprived of their liberty interest in pursuing their chosen profession. The district court in the Virgin Islands held that the plaintiffs could not make out a due process liberty claim because there was still substantial work in the occupation that they could perform. *See id.* at 433. The court found that despite the agreement, the plaintiffs could still pick up pre-paid tour passengers, which the court noted was "a significant portion of the taxicab business at the dock," and, the agreement only concerned the one dock. *Id.* Thus, the plaintiffs could still "pursue fares at other locations on the island." *Id.*

Furthermore, other circuits have also addressed this issue, particularly the seventh circuit. *See Bernard v. United Township High Sch. Dist. No. 30,* 5 F.3d 1090, 1092 (7th Cir.1993) (holding that intimidation by school which caused retailers to pull plaintiff's drawing from their stores did not interfere with his occupational liberty because it did not stop him from selling the prints altogether or prevent him from selling other prints); *Wroblewski v. City of Washburn,* 965 F.2d 452, 455–56 (7th Cir.1992); *Illinois Psychological Ass'n v. Falk,* 818 F.2d 1337, 1344 (7th Cir.1987) (holding that a regulation which barred psychologists from hospital staffs only curtailed their occupational liberty because they could still practice psychology).

*Wroblewski v. City of Washburn,* 965 F.2d 452 (7th Cir.1992) is analogous to the situation in this case. There, Plaintiff Wroblewski operated a municipal marina until the city became unhappy with his performance and terminated his lease. City officials then solicited bids for a new operator but told bidders they would be penalized if they subcontracted any work back to Wroblewski. This basically shut the plaintiff out of employment at that Marina and he filed suit claiming he was deprived of the right to pursue his occupation. The Seventh Circuit held that he was not so deprived. *See id.* at 455. It concluded that the sphere from which Wroblewski was excluded cannot properly be called an "occupation" like the practice of law. *See id.* The court indicated that while it was not clear what Wroblewski's occupation or calling was, it certainly could not be narrowly defined as "operating the Washburn marina facility." *Id.* That definition, the court stated, was much closer to a specific job than an occupation. *See id.*

We hold that the Plaintiffs' right to pursue their occupation, although possibly curtailed or limited in some way, was not "severely limited", unreasonably altered or outright deprived by the conduct of the Defendants. Kepler testified that plaintiffs are taking advantage of a fair number of opportunities within their profession.[6] They are currently working for five different coal and metal mining operations— Consol, Carbon Industries, Arch Minerals, Upshur Properties and Luzerne Coal Company. Kepler depo. at 24, 188–90. They are also currently doing work for sureties. They are currently under contract with Cigna to treat the Morrison site [7] and are still negotiating with the DEP to do Reed/Strattanville as a passive system. Kepler depo. at 25, 133; McCleary depo. at 6. Further, Kepler also indicated in his deposition that they do design and consulting work for environmental agencies and are currently working with ALCOA and Cambria County Recreational Authority on potential plans to treat sites for aluminum and then recover the aluminum as a resource. Kepler depo. at 159.

Furthermore, just as there were significant work opportunities not covered by the agreement that the plaintiff in *Jackson* could perform, there are numerous work opportunities for the Plaintiffs that do not require Mirza's approval. They have in the past and are currently working on sites outside of Mirza's jurisdiction. The Lozerne sites are in Greensburg and the Upshur and Arch Minerals sites are in West Virginia. *See id.* at 24, 188–90. They have also in the past and may still in the future receive section 319 grants from the Bureau of Abandoned Mines. *See id.* at 83–85. Further, they have in the past and may still in the future work for environmental agencies and environmental groups such as the DEP, OSM, EPA, Ohio EPA, ODNR, Millcreek Coalition, Head-

---

6. Damariscotta's tax returns indicate that its income did decrease after 1993. However, the income in those subsequent years was not insubstantial.

7. Kepler and McCleary also indicated, however, that they were not sure of their status on the Morrison job because Cigna had not paid them or given them any direction. Kepler Depo. at 25; McCleary Depo. at 6.

quarters Charitable Trust and Monday Creek Watershed Association in Ohio. *See id.* at 26–27, 158–59.

Moreover, while the plaintiffs assert that since Mirza's threat, they have not been retained by any surety or permittee for a site that requires approval by the Knox district, they, like the plaintiff in *Latessa,* allege few specific instances in which they submitted a plan or applied for work and were denied. In fact, they only allege three instances where they applied to the District Mining Office and were rejected. Kepler was asked in his deposition if there were any plans they submitted since the threat that were "ultimately" rejected by the Knox office. He could only point to the Hanley Brick and Cigna plans. *See id* at 32.

In essence, like *Wroblewski,* the plaintiffs are attempting to define the occupation narrowly. While their definition is not as narrow as the specific facility argued in *Wroblewski* or the racing judge position at issue in *Latessa,* their own past work history and current projects certainly demonstrate that it is too narrow. They are attempting to limit the scope of their occupation to jobs which require the approval of Defendant Mirza, meaning passive treatment projects which require a plan submitted to the Knox District Mining Office. We believe instead that the occupation should be defined as the design

of passive treatment systems for acid mine drainage sites located within a reasonable geographic area. This definition includes section 319 work as well as the formulation and oversight of plans for coal and mining companies, sureties and environmental groups. Geographically, it at least includes other Pennsylvania DEP districts and other states where the Plaintiffs worked in the past or are currently working.[8] Using this definition, the Plaintiffs have not shown unreasonable interference with their right to pursue their occupation.

In light of the above analysis, we need not address the other issues raised by the parties, which include preclusion of the claim by the availability of post-deprivation remedies, supervisory liability and qualified immunity.

### IV. CONCLUSION

An appropriate order follows.

### *ORDER*

AND NOW, this ＿ day of March, 1999, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant's motion for summary judgment [Doc. No. 42] is GRANTED. Defendant's motion to strike [Doc. No. 51] is DENIED as moot given the first amended affidavit

---

**8.** *Westphal v. City of Chicago,* 8 F.Supp.2d 809 (N.D.Ill.1998), is also instructive as to how this Court should define the "occupation." In that case, the plaintiffs were Chicago Police Officers who were placed on "limited duty" service within the Chicago Police Department. This meant that they were "prohibited from performing a police officer's full duty tasks due to medical or mental restrictions." *Id.* at 811. Plaintiffs asserted in their complaint that the defendants used this "limited duty" status to violate their liberty interest by denying them the right to bid for available jobs, have their seniority rights recognized and be considered for promotions. The court held that their liberty interests were not implicated because all they were alleging was that they were "foreclosed from specific jobs within the Chicago Police Department." *Id.* at 813. According to the court, the plain-

tiffs had defined their occupation too narrowly; rather than alleging that they were "foreclosed from their occupation of being police officers," they merely alleged they were denied promotions or available transfers. *Id.* The court found it significant that they did not allege that "the defendants' policies [ ] foreclosed employment opportunities outside of the Chicago Police Department." *Id.* Similarly, the Plaintiffs have not alleged that defendants conduct has foreclosed any employment opportunities outside the Knox District. In this respect, however, we stress that our holding does not imply that a person must unreasonably expand the reach of his or her business or move his or her residence to a new location. In this case, it is significant that the Plaintiffs' own testimony regarding where they do business has defined the reasonable geographic scope of their occupation.

and the defendants failure to object thereto.